REGAN & COMPANY, Inc. (formerly C. W. Regan, Inc.), Plaintiff,

v.

UNITED STATES of America, Defendant.

UNITED STATES of America, Plaintiff,

v.

Charles W. WEISMAN, Defendant.

Nos. 63–C–631, 66–C–653.

United States District Court
E. D. New York.

June 27, 1968.

M. Carl Levine, Morgulas & Foreman, New York City, Edwin Efros, New York City, of counsel, for plaintiff, Regan & Co., Inc.

Joseph P. Hoey, Brooklyn, N. Y., Gerald Fain and Stanley Greenblatt, Asst. U. S. Attys., Tax Div., Washington, D. C., of counsel, for the United States.

MacArthur & Walsh, Albany, N. Y., James P. Walsh, Albany, N. Y., of counsel, for defendant, Charles W. Weisman.

ROSLING, District Judge.

In the first of the two cases consolidated for trial the plaintiff, Regan & Company, Inc., ("Regan"), sues to reclaim from the government taxes and interest assessed and collected pursuant to Section 6672 of the Internal Revenue Code of 1954, ("IRC 1954"), as in force at the time (26 U.S.C. 1964 Ed., Sec. 6672).[1] The relevant taxes are with-

---

1. Section 6672 reads:

"Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to *evade* or *defeat* any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under section 6653 for any offense to which this section is applicable." (Emphasis supplied.)

holding and social security taxes[2] for the second and third quarters of 1959 referable to the wages earned by employees of Vince's Concrete Company, Inc. ("Vince"). The sum which is sought to be recovered by Regan is $14,361.* ($14,318. in taxes and $42. in accrued interest). This sum was paid on July 23, 1962, on which date Regan also filed a claim for a refund with the District Director.

The second of the consolidated actions is brought by the government against Charles W. Weisman to reduce an assessment of like origin against him to judgment upon an allegation of liability generated under the same Code provisions.

■ The issues[3] presented to the court for its resolution are whether the Regan company and Weisman each was a "person"[4] required to collect, truthfully

2. IRC (1954) Section 3101 as amended by Section 401(b), Social Security Amendments of 1958 (P.L. 85–840, 72 Stat. 1013, 26 U.S.C.1966 Ed. Sec. 3101), headnote "Rate of Tax", reads:

"(a) Old-age, survivors, and disability insurance.—

"In addition to other taxes, there is hereby imposed on the income of every individual a tax equal to the following percentages of the wages (as defined in section 3121(a) received by him with respect to employment (as defined in section 3121(b))—

"(1) with respect to wages received during the calendar year 1959, the rate shall be 2½ percent;"

Section 3102 as amended by Section 205A Social Security Amendments of 1954, c. 1206, 68 Stat. 1052, and Section 201 (h) (3), Social Security Amendments of 1956, c. 836, 70 Stat. 807, [26 U.S.C.1964 Ed. Sec. 3102], headnote "Deduction of Tax from Wages" read pertinently:

"(a) Requirement.—The tax imposed by section 3101 shall be collected by the employer of the taxpayer, by deducting the amount of the tax from the wages as and when paid. * * *"

Section 3401(d) of the 1954 Code [26 U.S.C.1964 Ed. Sec. 3401(d)] defined the term "Employer" for the purposes of Chapter 24 "Collection of Income Tax at Source on Wages" as

"the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person, except that—

"(1) if the person for whom the individual performs or performed the services does not have control of the payment of the wages for such services, the term 'employer' (except for purposes of subsection (a)) means the person having control of the payment of such wages, and * * *."

Section 3402, as amended by Section 2(a), Act of August 9, 1955, c. 666, 69 Stat. 605, [26 U.S.C.1964 Ed., Sec. 3402] imposes the duty upon an employer as defined in Section 3401, "making payment of wages [to] deduct and withhold upon such wages [exception inapplicable and omitted] a tax equal to 18 percent of the amount by which the wages exceed the number of withholding exemptions claimed, multiplied by the amount of one such exemption as shown in subsection (b) (1)."

Liability for the withholding tax is declared in Section 3403 which provides that "[t]he employer shall be liable for the payment of the tax required to be deducted and withhold under this chapter * * *."

* Pennies are dropped throughout this opinion.

3. The parties failed in their pretrial proceedings to achieve a joint stipulation specifying the issues that were to be litigated. Instead the Regan and Weisman in a joint statement set out nine items which they claimed constituted the "Issues of Law and Fact." These appear, however, to be entirely allegations of fact. The government for its part presented an equal number of what it alleged were "Issues of Fact and Law." Of these the first six are factual, and the last three, legal conclusions. These last provide a basis for the Court's own definition in the text of what was in fact litigated before it.

4. Section 6671(b) (26 U.S.C.1964 Ed. Sec. 6671(b)) defines the word "person" as used in Section 6672 as follows:

"The term 'person', as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs."

Code Section 7701, supplying construction applicable to terms used throughout the entire body of the Code "where not otherwise distinctly expressed or manifestly incompatible with the intent thereof", declares that "[t]he terms 'includes' and 'including' when used in a

account for, and pay over the withholding and social security taxes with regard to Vince for the quarters involved, and whether as such persons they willfully failed in fulfilling the several obligations thus enjoined upon them.

The facts hereinafter reported as found represent either those facts stipulated by the parties and adopted in their pretrial order or as to which there is no substantial dispute in the evidence, and when the respective versions are in conflict or disparate inferences may be drawn, the version or inferences sponsored by the government[5] have been adopted.

The Regan corporation was de facto a joint venture comprised of Nager Electric Company (the "Nager") and Weisman Construction Company, Inc., (the "Weisman Company"). The agreement which gave birth to the Regan was entered into July 10, 1958. Regan was formed to execute and perform a prime contract with the United States Army for the construction of a radar warning network at Lockport, New York. Defendant Weisman was president of the Weisman Company and owner, together with his wife, of all its outstanding stock. He became president of the Regan company at its inception. The precise

date of his resignation from that office is uncertain. He testified it occurred about June 1959, but the circumstance is not established by credible proof. The government's legal position in this suit, however, is unaffected by such uncertainty. For irrespective of his official designation Weisman continued to function in fact as managerial head of Regan with duties and authority undiminished throughout the project until full performance of the contract, a point reached late in 1959 or early 1960. In part his presence at the Lockport site was motivated by a desire to protect his own financial interest in the Weisman company whose profits from Regan were drawn in the form of the salary he personally received from Regan.

Weisman was in over-all charge of the radar project, with complete responsibility for running the job. He negotiated all subcontracts, coordinated the efforts of subcontractors, made provision for supplies and dealt with vendors, planned the construction work and functioned as business manager.

On September 3, 1958, the Regan company,[6] represented by Weisman as negotiator, entered into a subcontract with the Vince company for performance by Vince of concrete work at Lockport.

---

definition contained in this title shall not be deemed to exclude other things otherwise within the meaning of the term defined."

Further discussion as to the eligibility of Regan and of Weisman for the roles of vicarious liability to which the government assigns them is reserved for later points in this decision where the factual findings provide an appropriate context.

5. In an action to recover from the government taxes assessed and collected or a penalty alleged to have been collected without authority, the plaintiff has the burden of proof as to all issues including the negation of one's status as a person whose duty it is to pay over Withholding and Social Security taxes or of making an affirmative showing that one did not willfully fail to comply with that duty. Phillips v. Dime Trust & Safe Deposit Co., 284 U.S. 160, 52 S.Ct. 46, 76 L.Ed. 220 (1931); Reinecke v. Spalding, 280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385

(1930); United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926); Horwitz v. United States, 236 F.Supp. 812 (S.D.N.Y.1964), aff'd 339 F. 2d 877 (2d Cir. 1965). It is true that where the government seeks to reduce its assessment to judgment, the burden rests upon the government, but that burden is prima facie met by proof of the assessment. United States v. Rindskopf, 105 U.S. 418, 26 L.Ed. 1131 (1882); United States v. Molitor, 337 F.2d 917 (9th Cir. 1964); Melillo v. United States, 244 F. Supp. 323 (E.D.N.Y.1965); Thurner v. United States, 260 F.Supp. 292, 294 (E. D.Wis.1966); Datlof v. United States, 252 F.Supp. 11, 32 (E.D.Pa.), aff'd, 370 F.2d 655 (3d Cir. 1966), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 624; Horwitz v. United States, supra.

6. Then known as C. W. Regan, Inc. Its name was later changed to Regan & Company, Inc.

Representing Vince was its president D'Innocenzo. Thereafter the subcontract was administered for the joint venture by Weisman with the collaboration of his job superintendent, Jack Prahl, who in all his conduct in the Lockport operation acted as agent for the Regan. Vince's contract with Regan called for it to set the forms in place and finish the concrete. Weisman told D'Innocenzo to do his job and assured him the necessary monies would be made available to him. Financial matters were not to be D'Innocenzo's concern.

In the initial stages of its performance the Vince company maintained two bank accounts with the Manufacturers and Traders Trust Company in Niagara Falls. One was a general account and the other a payroll account. D'Innocenzo alone was authorized to draw checks on these accounts. At first the Regan company would make payment to the Vince by check. Later the procedure was changed whereby funds would be made available to the subcontractor by means of bank transfers from the Regan company account in New York City to Vince's Niagara Falls accounts. The amount of money to be transmitted from Regan in New York to the Vince Niagara Falls bank accounts was based on Weisman's requests. Remittances were made weekly. Using the Vince accounts, D'Innocenzo paid the Vince bills, including those for taxes payable to the Internal Revenue Service.

From October 14, 1958, through November 3rd of the same year the Regan had made direct check payments to the Vince totalling $26,731. An additional payment of $7,135 was made on November 3, 1958, by Regan to a materialman for Vince's account.

Eleven bank transfers of funds from the Regan New York City account to the Vince Niagara Falls accounts totalling $74,000 were made during the period between November 13, 1958, and March 9, 1959. Shortly after the latter date in consequence of a conversation between Weisman and D'Innocenzo a change in the financial procedures of the two companies, shortly to be noted, was effected. The circumstances which prompted Regan's action were testified to by Weisman with a vagueness which left the Court with the distinct impression that it was Regan's purpose at the time to take an ambiguous position so that future action by Regan might not be encumbered by a prior "hard" decision.

■ Weisman felt, so he testified, that Vince had at that point, namely in March of 1959, been overpaid by Regan relative to the dollar value of the concreting completed. The excess he estimated as amounting to between twelve and fifteen thousand dollars. Weisman professed to believe that the subcontractor had from the sums received by it from Regan been using a part to pay expenses and bills on jobs other than the one covered by the subcontract between the parties. The proof on the subject was less than complete. The record as made, however, appears to favor the Regan-Weisman claim, but even if accepted by the Court as appropriate for a finding, as motivating Regan's closer involvement in Vince's affairs than had theretofore been the case, it does not follow that Regan is to be exonerated from § 6672 liability based on its own conduct in the handling of Vince's funds.

Weisman in the March 1959 discussions with D'Innocenzo directed him to close out the two Niagara Falls Vince accounts. As a consequence of the discussion Regan on March 16, 1958, caused a new account to be opened in Vince's corporate name at the Lockport branch of the Manufacturers bank. With respect to such account Weisman and Prahl were the only persons authorized to sign. A single signature sufficed.

D'Innocenzo, as secretary of Vince, executed the customary attestation forms for filing with the bank. In practice it was Prahl alone who signed the Vince checks thereafter drawn. The Regan company following the closing of the two Vince Niagara accounts and the opening of the Vince Lockport account continued to make bank transfers to Vince,

but by directing them to the Vince Lockport account for deposit controlled the earmarking of their disposition. In all there were twenty-six such transfers, the first being made on March 13, 1959, and the last on August 28, 1959. The transfers aggregated $140,000.

When the change in financial procedure had been effected with no resistance on D'Innocenzo's part, D'Innocenzo and the Vince bookkeeper were removed from that corporation's payroll by the simple expedient of not earmarking any funds for salary payment to them from the Lockport account. The natural and not unanticipated consequence was that D'Innocenzo took on some minor jobs, presumably to keep body and soul together. What is clear from the record as a whole is that after March 16th there was not the slightest likelihood that the Vince company would be able to pay withholding and social security taxes on the wages of its Lockport laborers unless Weisman or Prahl drew a Vince company check on the Lockport corporate bank account and deposited Regan money to meet it.

It is the Regan-Weisman contention that they could without becoming liable under Section 6672 oust the Vince financial management in the fashion they did, crawl into the Vince corporate shell, utilize the corporate facilities and labor to complete the Regan prime contract with the defense department, and in the meantime provide only such funds for labor and other charges as would keep Vince going, without making provision for the accruing withholding and social security tax obligations. The time lag pending the institution of government enforcement procedures would enable the intruding Regan to utilize the corporate carapace and facilities for Regan's purposes before Vince was put out of business by such enforcement. Now when called upon to make good these tax claims that surely were integral to Vince's performance as an arm of Regan, Regan seeks to insulate itself from Vince's tax liability by insisting upon the independent existence of each of the corporate entities.

Regan's intrusion into Vince's affairs with Weisman as its agent plenipotentiary has been too deep and its involvement too gross to permit of escape from section 6672 liability. Let us consider in this connection the incidents of such involvement.

After March of 1959, D'Innocenzo ceased to appear regularly on the job. Vince's superintendent attended as in the past, but it was Prahl who gave the orders for work to be done, including extras not specifically covered by the subcontract.

The laborers hired by Vince continued in their employment, and the Vince job clerk would as he had previously done prepare the payroll sheets. On the basis of these records Regan would provide a round sum sufficient to cover the take-home pay of these workers. The money remitted by Regan to meet the Vince payrolls would be deposited in Vince's Lockport bank account. Against the balance in the account Prahl would draw a check and deliver it to D'Innocenzo. Mary Prahl, wife of the Regan superintendent, would thereupon accompany D'Innocenzo to the bank where the payroll check would be cashed. She would then help him stuff the individual pay envelopes of the workers with their net wages. It does not appear to have been part of her practice, however, to be present at the actual distribution of the wages to the men.

The payment of Vince's bills for materials and of charges other than for labor in the manner just described was similarly funnelled through the Regan controlled Lockport bank account of Vince with Vince's checks being issued to only those creditors whom the Regan-sponsored signatories, Weisman and Prahl, approved and nominated for payment. During this period Vince continued to maintain the requisite records reflecting the withheld income and social security taxes accruing in respect of the wages of the workers who were com-

pleting its subcontract with Regan. Vince also prepared the necessary schedules, including the form 941 quarterly returns for the second and third quarters of 1959. These were submitted by D'Innocenzo to Regan for payment. Weisman, however, refused to authorize such payment. His refusal was based upon his determination that Vince had ben overpaid for its partial performance calculated to date under the subcontract. And so the tax liabilities remained unsatisfied.[7] Realistically, under the procedure established and enforced by Regan no other source for payment of these obligations was available to Vince.

7. Whether D'Innocenzo was given positive assurance by Weisman that Regan would pay Vince's withholding income taxes and FICA social security obligations is uncertain even upon a consideration of the testimony of D'Innocenzo alone, and without taking into account Weisman's unequivocal denial of any such assurance. D'Innocenzo had testified by deposition in January of 1967, that he had been told by Weisman in March of 1959 "that they will take over the checkbook; they will take over paying the men; they will pay the material; they will pay all taxes, and so on and so forth." Redeposed in August of 1967, D'Innocenzo gave a version which was less forthright, as may be seen from the series of questions and answers which follow.

The scene is set by the deponent D'Innocenzo, as "after the closing of the two accounts in the Niagara bank and the opening of the Lockport account * * * in March of 1959 * * *." D'Innocenzo's accountant, according to his deposition, would make out the quarterly tax return and D'Innocenzo would submit it for payment to the Regan Company. The delivery of the return would be phys'cally made to Jack Prahl or Mary Prahl.

"Q. Was it your understanding, Mr. D'Innocenzo, that at the time you submitted the quarterly tax returns to Regan and Company that they would be paid by Regan and Company?
"A. That's what I assumed they would be paid by them, right.
"Q. Did anybody ever tell you that?
"A. No.
"Q. What was the basis for your assumption that they would pay the tax?
"A. Well, my assumption was we turn the bill in, we expect that to be paid.
"Q. Did you have any source of funds in Vince's Concrete Company with which to make payments?
"A. No."

Significant, however, is the fact that the Vince checkbook stubs reflect the issuance after the March 1959 takeover of checks dated and purposed as follows:

April 3, 1959 — For Director of Internal Revenue $1229.58
April 30, 1959 — For Director of Internal Revenue $3504.38
May 15, 1959 — For Director of Internal Revenue $3225.68

Weisman's testimony was given with a pseudo-frankness, but the Court appraised it as a studied obscurantism. Vagueness by that witness in this connection appeared to be out of character in one so shrewd. It was quite clear that Weisman in Regan's behalf was deeply concerned that the government's axe should not descend on Vince's neck before its workers had been able to finish without interruption the concreting segment of Regan's contract with the army. In achieving this objective Regan found itself constrained to pick up the tab for the tax quarters *prior* to the second quarter of 1959 (April 1st to June 30th), as to which Vince was in arrears, and to do so notwithstanding that under its subcontract Vince alone was accountable for these taxes. It was manifestly Regan's expectation, borne out by the event, that Vince's people would be able to complete their concrete work before the government, moving with a fair measure of expedition, but still too slowly, could halt Vince's operations by a timely distraint or other enforcement procedure. Regan, therefore, at Weisman's direction paid the Vince arrearage to the Treasury by the two April and the single May checks listed above, but merely *filed* the later second and third quarter 931 returns for 1959, which Vince had submitted to it for *both* payment and filing. Meanwhile, Regan strove to stage manage and to mask the incidents of its involvement in Vince's affairs as best it could. It is a fair inference which the Court draws that Regan kept its takeover arrangement oral, unspecific and ambiguous in preparation for the inevitable claim that the government when it finally moved, would assert against it of section 6672 liability.

Regan finally in September 1959 "defaulted" Vince and undertook as its direct operation the completion of the work called for by the Vince subcontract.[8]

Weisman makes a showing which the court accepts that by September 1959 the total of all forms of payment by Regan to or for the account of Vince exceeded by almost $50,000 the value of the concrete work in place.

The subcontract was explicit in its requirement obligating Vince to pay, among other liabilities the taxes for the nonpayment of which the assessments sub jud. were filed. But the parties may not by the contract between them avoid the section 6672 liability to which their conduct subjects them.

### Discussion

Pacific National Insurance Company v. United States, 270 F.Supp. 165 (N.D.Cal. 1967), presents a circumstantial picture approximating that here under consideration. The case provides the most recent exposition of the legal principles to which the courts resort in determining whether a section 6672 liability such as is here asserted by the government exists. The "person" liable under that provision, the *Pacific* opinion points out, "is not limited to the employer * * *. Rather, it is the one whose discretion is exercised in finally deciding which creditors are to be paid and when." (In *Pacific* the "person" was the plaintiff surety which had "assumed *absolute* * * control of all of the funds available to the contractor" in respect of whose employees the unpaid withholding and FICA taxes had accrued.)

*Pacific* cites in support of its thesis White v. United States, 372 F.2d 513 (Ct.Cl.1967), from which it quotes the following (id. p. 516):

" * * * a responsible person is most frequently defined as a person who has 'the final word as to what bills or creditors should or should not be paid and when.' To that effect, see, e. g., United States v. Graham, [309 F.2d 210 (9th Cir. 1962)] supra; Bloom v. United States, 272 F.2d 215 (9th Cir. 1959), cert. denied, 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146 * * *."

---

8. The "defaulting" is evidenced by a registered letter dated September 3, 1959, addressed by Prahl to Vince, followed by a telegram under date of September 15, 1959.

The letter, receipted for by D'Innocenzo on September 10, reads:

"In view of the fact that we consider that you have been in default of your contract on this project we call upon you to forthwith complete all work called for under the terms of your contract. This notice is given you as per the requirements of your sub-contract with us.

"A preliminary [sic] recapitulation of the money due you and the monies which we have laid out for you indicates that you are in default to us of approximately thirty thousand dollars ($30,000.00). We therefore call upon you to make good this amount within the next thirty days or we shall be forced to take the necessary legal steps to satisfy the above conditions. We further point out to you that you are not to remove any materials or equipment from the project site.

"We find that at this moment we are doing part of your concrete work with our forces in order to meet the contract dates of completion. You are herewith notified to put your men to work where we are carrying on for you. Failure to do so will be considered by us to be default of contract.

"Your creditors have repeatedly informed us that you have not paid your current bills and we have knowledge that you have not paid government agencies money withheld from the payroll. These bills and monies must be forwarded immediately to those who have just demand on them.

"Our contract calls for you to meet all your obligations and we herewith call upon you to carry out the letter of your contract."

The wire of September 15th runs as follows:

"In view of the fact that after duly notifying you according to the terms of our contract you have failed to complete the job. We herewith declare you in default of your contract and notify you that we will avail ourselves of all legal remedies."

** italicized in original.

The Regan-Weisman activities which the government argues subject them to section 6672 liability are to be considered and interpreted in light of what their specific objectives were and how they set about achieving those objectives. It is fairly inferable from the evidence adduced that their primary objective was the completion of the subcontracted segment of the Regan prime contract by the use of a competent labor force immediately available which, however, could be utilized by Regan at minimum cost. Vince had such competent labor force on the job.

Corollary to such objective was an answer to the question as to how to circumscribe Regan's involvement in Vince's affairs while at the same time keeping that force working at such minimum cost. Manifestly, if the men were not paid they would not work. They, therefore, had to be given their takehome wage. Yet, if Regan were, to pay each man his earnings directly, the relationship between Regan and the men might "jell" into the legal status of employer and employee, with a resultant direct obligation on Regan as "employer" to comply with an employer's obligation to withhold and pay under 1954 Code Section 3102, (Social Security), and Sections 3402 and 3403 (Withholding Tax).

If, on the other hand, Regan were merely to *advance* to Vince sufficient moneys for it to meet its net labor costs and other bills, the prompt payment of which could not be avoided if the job were to go forward Regan might under a well-recognized principle [9] be held to be no more than a lender of moneys to Vince, with no obligation to lend a sum in excess of what it chose to provide, nor to provide funds for purposes other than those it designated as a condition of the advances made. That Vince, without significant resources other than those provided by Regan, would inevitably become delinquent in the payment of the withholding taxes that accrued while Regan's concrete work went forward was obvious from the outset. Regan must have been aware of that immediately, or studiously refrained from inquiry so as not to learn that which to a business man of Weisman's astuteness surely would at once have been apparent.

■ Regan argues that it was not until Code Section 3505,[10] "Liability of

9. Banks which make loans to contractors or subcontractors and surety companies which post completion bonds for their principal's performance on occasion find their debtors delinquent and their obligors in default. Their problem then is how to avoid incurring liability under the 1954 code sections, (§§ 3102, 3402, 3403, 6672) and related provisions. Illustrative of such financial institutions endeavors with considerable success to walk on eggs are United States v. Hill, 368 F.2d 617 (5th Cir. 1966); Westover v. William Simpson Const. Co., 209 F.2d 908 (9th Cir. 1954); Girard Trust Corn Exchange Bank v. United States, 259 F.Supp. 214 (E.D.Pa.1966); Arthur Venneri Company v. United States, 169 Ct.Cl. 74, 340 F.2d 337 (1965). The enactment of section 3505 discussed in the text, supra pp. 14, 18, 19 and quoted in footnote 10, enhances the difficulty for the banks and sureties.

10. "§ 3505. Liability of third parties paying or providing for wages
"(a) Direct payment by third parties.— For purposes of sections 3102, 3202, 3402, and 3403, if a lender, surety, or other person, who is not an employer under such sections with respect to an employee or group of employees, pays wages directly to such an employee or group of employees, employed by one or more employers, or to an agent on behalf of such employee or employees, such lender, surety, or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) required to be deducted and withheld from such wages by such employer.

"(b) Personal liability where funds are supplied.—If a lender, surety, or other person supplies funds to or for the account of an employer for the specific purpose of paying wages of the employees of such employer, with actual notice or knowledge (within the meaning of section 6323(i)(1)) that such employer does not intend to or will not be able to make timely payment or deposit of the amounts of tax required by this subtitle to be deducted and withheld by such employer from such wages, such lender, surety, or other person shall be liable in his own

third parties paying or providing for wages", added Pub.L. 89–719, Title 1, § 105(a), Nov. 2, 1966, 80 Stat. 1138, became effective on January 1, 1967, with respect to wages paid on or after such effective date, that one who stood in the Regan-Weisman relationship to the Vince company could be held liable, although technically not an employer or a section 3401(d)(1) quasi-employer, for withholding and social security taxes accruing. Such argument appears to contemplate acceptance of the thesis that section 6672 does no more than reiterate and duplicate what section 3102 declares concerning employer liability for Social Security deductions and sections 3402 and 3403 enjoin respecting income tax withholdings.

We have, however, in such successive enactments no meticulous articulation of segregated provisions, each intended to operate only within its own sharply defined grouping of taxable entities in an appropriate legal relationship of persons and events. Instead there is a not unusual measure of overlapping of the several provisions as Congress sought to plug the loopholes against the limitless ingenuity of those whose métier it is to search for crevices between mortise and tenon in the infinitely complex definition and imposition of obligations in the Revenue Code. Congress' purpose, however, is never in any doubt. It was to get into the public treasury that part of a worker's wage that has been earned by him, but has been withheld by another, to offset the credit which the government stands committed to give the worker irrespective of whether the sums withheld were in fact remitted by the withholder to the government.

Manifestly such a system cannot function unless the law, initially statute, but in the course of time accreted by deci-

sional gloss, were to focus upon some one person, broadly defined, and, when necessary, judicially determined ad hoc, as responsible for withholding and remittance to the fisc.

Thus section 3401(d)(1) designates as the responsible person the one for whom an individual performs services as an employee except in the situation where the person whom the individual serves does not have control of the payment of wages for such services. In such latter event the responsible person means the person having control of the payment of such wages. Illustrative of the operation of such proviso is the imposition upon a trustee in bankruptcy who pays preferred wage claims for services rendered by the claimants to the bankrupt, of the status of an employer. The trustee as surrogate for the employer is required to withhold and remit with respect to the "wages" he has paid for services rendered to the bankrupt. See United States v. Curtis, 178 F.2d 268 (6th Cir. 1949); United States v. Fogarty, 164 F. 2d 26, 174 A.L.R. 1284 (8th Cir. 1947). See also Federal Tax Regulations, section 31.3401(d)–1(f) (1968).

Section 3401 of the 1954 Code is derived from similar provisions in section 1621 of the 1939 Code, subdivision (d)(1), of the latter section being reenacted substantially without change. Section 6672 of the 1954 Code, however, deriving from a number of 1939 Code provisions, shows no such continuity of scope or effect. Whereas section 6672 functions throughout the income tax *title,* the source provisions of the 1939 Code are specific and restricted in their application to narrowly defined areas. Thus section 1718 of the earlier code provides a section 6672 type penalty with respect to 1939 Code Chapter 10 "Admissions and Dues" imposts; section 1821

person and estate to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States by such employer with respect to such wages. However, the liability of such lender, surety, or other person shall be limited to an amount equal

to 25 percent of the amount so supplied to or for the account of such employer for such purpose.

"(c) Effect of payment.—Any amounts paid to the United States pursuant to this section shall be credited against the liability of the employer."

(a) (3) applies only to Chapter 11 which provides for levies on "Documents, Other Instruments, and Playing Cards"; 1939 Code section 2557(b) (4) fixes liability for payment of the chapter 23 tax on "Narcotics", subchapter A "Opium and Coca Leaves"; and section 2707(a), the fourth and last of the source provisions, deals with the tax levied under the single section 2700 upon pistols and revolvers.

■ It is to be noted that in none of these earlier provisions is the relationship of employer and employee declared to be relevant to the duty to collect the tax, pay it, keep records, file returns or remit. When section 6672 was enacted, its sweep was deliberately widened and generalized so that it embraced every one of the infinite variety of taxable situations encompassed by Title 26 in which some individual or entity was placed under a duty to collect and remit a tax to the government. The concept of withholding, which represents a post-1913 accession to the methodology of tax collection, is by now a well recognized and proper tool for insuring that others than the taxpayer who retain the tax accruing on his gross wage turn it in to the Treasury. It is inappropriate for this Court to strain at gnats to effectuate a scheme whereby the one who in a substantial sense has received the benefit of all the services of the worker, can escape liability for the part to be withheld by providing only the residue of the wage which is demanded by the worker for his continuing toil.

■■ Section 6672 may well be read so that it is in part duplicative of section 3401(d) in situations involving employers in the accepted sense and "employers" who are held to be such only by virtue of the exception in section 3401 (d) (1). But the reach of section 6672 is of a far broader scope, encompassing in most general language the activities of one whose involvement in the taxpayer's affairs is such that he can and does thwart the payment out of the taxpayer's funds into the Treasury in satisfaction of its preferred claim by disposing of those funds for the other purposes not so preferred. The Regan-Weisman absorption of the Vince company's functions falls fairly within the ambit of what section 6672 was intended to cover, though it may lie beyond that which sections 3102, 3402 and 3403 purport to regulate.

Section 3505 ploughs new ground. Theretofore under decisional law it had been legally possible for a bank or a surety to maintain a circumspect position outside the business structure of a shaky employer and to transfuse funds into the enterprise which enabled it to meet its payroll, but made default as to the withholding taxes inevitable by providing no funds to which the employer might resort to satisfy those obligations. The bank or surety would thereby gain time for the employer to reduce or liquidate its new advances, expenditures and outstanding arrears to them from progress payments earned in part by the current labors of its workforce and received pending the employer's inevitable collapse; and when that collapse occurred it would be found that the bankrupt employer, now delinquent as to his withholding taxes and without resources, had operated for the private advantage of the lender bank or surety confronting liability under a completion bond with the government's unpaid withholdings as the insolvent's working capital.

Under case law (see infra, p. 478, fn. 9) banks and sureties were held not liable for the unpaid withholdings provided they had maintained a sufficient aloofness, real or contrived, in their contacts with the day-to-day activities of the employer despite the patent fact that they knew that improvement in their position was a function of the worsening of the government's vis-a-vis the employer. Section 3505 sought to plug that tax loophole, but its inapplicability by reason of its effective date does not save Regan-Weisman from liability under section 6672. Regan sought to steer a middle course in which it would assume effective control of the Vince company for Regan's immediate advantage, namely, the completion of its government contract

in respect of the portion sublet to Vince, and to insure the application of the funds that such completion was generating for Vince to only such obligations of Vince as Regan designated. These obligations did not include the subject tax items.

The performance by Vince between March of 1959 and the September "default" saw the cost of completion deficit grow from an initial twelve or fifteen thousand dollars at the takeover to $50,-000 at its conclusion. During the same period the utilization by Regan of the services of the Vince workers earned for them the wages, the payment of which in turn obligated the Vince company to withhold the taxes now in litigation, and exposed D'Innocenzo to section 6672 liability in respect of them. *Someone* had to qualify as obligated under that provision for the role of one required "to collect, truthfully account for, and pay over" these taxes, and if the Regan-Weisman team were successful in a disclaimer, only D'Innocenzo would remain as an eligible candidate for the dubious distinction.

D'Innocenzo, it is manifest, had nothing to gain and much to lose if he were to turn over his company for Regan's sole aggrandizement without receiving assurance from Weisman that the withholding would be taken care of by Regan. It would have been wiser otherwise for him to discharge his workers than to incur an increasing liability without current benefit or prospect of any. D'Innocenzo says he received such assurance, and it is found by the Court that by explicit promise or clear implication Regan committed itself to meet the tax indebtedness in question.

It is the Court's further view that the Weisman vagueness in his testimony as earlier adverted to concerning the circumstantial context of the March 1959 expropriation by Regan coupled with D'Innocenzo's ready acceptance of his ouster, harmonizes with the absence of any writing defining the relationship of the parties, individual and corporate, affected by the transition. They support the conclusion that D'Innocenzo was be-

ing cajoled by the assurances he claims Weisman gave him concerning the withholdings, past and future, with Regan meanwhile contriving to keep the situation flexible and malleable against the day when that company might in some setting or litigation arising out of its post-takeover activities be called upon to declare precisely what its status had been vis-a-vis the Vince.

In an assessment of the relationship between Regan and Vince during the critical period any equivocal conduct on Regan's part must be considered by the Court for its bearing upon the burden of proof which weighs upon Regan and Weisman, or of carrying it forward. Nor is that burden any lighter as we consider Justice Holmes' memorable aphorism that "[m]en must turn square corners when they deal with the Government." (Rock Island, A. & L. R. Co. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920).)

█ It is true that Regan and Weisman were not "employers" of Vince's employees in any technical sense, but employment is not the touchstone of liability under section 6672. It suffices for liability to attach under that provision that the summation of the activities of a person charged with the duty under the provision may constitute a willful attempt "in any manner to evade or defeat any such tax or the payment thereof." It is consonant with the intent of the provision that one be held liable thereunder who in his selfinterest and clothed with the taxpayer's mantle of authority frustrates payment by the exercise of a substantial control of the employer. Regan and Weisman burrowed too deeply in Vince's affairs to escape such liability. They warmed themselves too closely to the fire to avoid being singed. See Pacific National Insurance Co. v. United States, supra; White v. United States, 372 F.2d 513, 516 (Ct.Cl.1967); Melillo v. United States, 244 F.Supp. 323 (E.D.N.Y.1967).

The willfulness which section 6672 stipulates as a condition precedent for imposition of its sanctions is here pres-

ent. See Spivak v. United States, 370 F.2d 612 (2d Cir.), cert. denied, 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967); Bloom v. United States, 272 F. 2d 215 (9th Cir. 1959), cert. denied, 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146 (1960); White v. United States, supra. Regan and Weisman as "persons," responsible for collection and payment of the taxes voluntarily, consciously, and intentionally preferred other creditors of Vince over the United States. That suffices to establish the element of willfulness.

The complaint of Regan against the United States is accordingly dismissed on the merits. Judgment for the sums assessed, to wit, $14,318.60 with interest from July 15, 1960, is awarded to the United States against defendant Weisman. Inasmuch, however, as the sums assessed have already been paid and satisfied by Regan as assessee, the judgment awarded against Weisman is conditional only, and such payment shall inure to the benefit of Weisman in the event that the judgment denying recovery to Regan shall become final upon any appeal taken, or, if no appeal is taken, upon expiration of the time for the taking of an appeal.