**William MAHLER, et al.**

v.

**UNITED STATES of America**

**Nos. CIV.A. 3:95 CV 2732(SRU), 3:96 CV271(SRU) through 3:96 CV273(SRU).**

United States District Court, D. Connecticut.

Sept. 30, 2000.

J. Michael Sulzbach, New Haven, CT, William M. Bloss, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, Edwin L. Doernbergerr, New Haven, CT, for Plaintiffs.

William A. Collier, Thomas V. Daily, U.S. Atty's Office, Hartford, CT, John V. Cardone, Fatina N. Purdie, U.S. Dept. of Justice Tax Division, for Defendants.

## MEMORANDUM OF DECISION

UNDERHILL, District Judge.

The plaintiffs, Russell Mahler, Sr. ("Russell Senior"), Stelle Mahler ("Stelle"),

Russell Mahler, Jr. ("Russell Junior") and William Mahler ("William") each commenced an action, now consolidated, to obtain refunds of money they had paid in partial satisfaction of federal tax assessments and liens levied against them. These assessments were made as one hundred percent penalties pursuant to the provisions of Section 6672 of the Internal Revenue Code, on the grounds that the plaintiffs had willfully failed to remit certain withholding and Federal Insurance Contributions Act ("FICA") taxes due and owing from them for the employees of their family business, Nutmeg Farms, Inc. ("Nutmeg"). The United States responded to the actions by asserting counterclaims, pursuant to Section 7401 of the Internal Revenue Code, for judgments against the plaintiffs in the amount of the assessed balance due. This decision follows a bench trial on November 30, December 1 and December 22, 1999, and constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Introduction

■ Sections 3102(a) and 3402(a) of the Internal Revenue Code require employers to deduct and withhold federal income and social security taxes from their employees' wages. These withheld sums are held "in trust for the United States," 26 U.S.C. § 7501(a), and must be paid over to the government on a quarterly basis. *See Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978). Such "trust fund taxes" are held for the exclusive use of the United States and are not to be used to pay the employer's business expenses, salaries, or for any other purpose. *Kalb v. United States*, 505 F.2d 506, 510 (2d Cir.1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *see also* 26 U.S.C. §§ 3102(b), 3403, 7501(a).

■ Once the federal income and social security taxes are withheld from the employees' wages, the employees are given credit for the payment and the United States is required to credit the amount withheld against the employees' individual income tax liabilities. 26 U.S.C. § 31(a); Treas. Reg. § 1.31–1(a). Accordingly, once an employer withholds taxes, the government has no recourse against the employees, even when the employer does not turn over to the United States the withheld amounts. *Fiataruolo v. United States*, 8 F.3d 930, 938 (2d Cir.1993); *Bowlen v. United States*, 956 F.2d 723, 726 (7th Cir.1992). The United States therefore suffers a loss of revenue when the trust fund taxes are not remitted by the employer. *See Slodov*, 436 U.S. at 243, 98 S.Ct. 1778; *Fiataruolo*, 8 F.3d at 938.

To protect the government from losses sustained by an employer's failure to remit withholding taxes, Congress enacted Section 6672 of the Internal Revenue Code. 26 U.S.C. § 6672. Section 6672 gives the Internal Revenue Service ("IRS") another source from which to collect the unpaid taxes, *Fiataruolo*, 8 F.3d at 938; *Gephart v.. United States*, 818 F.2d 469, 473 (6th Cir.1987) (per curiam), by providing "a mechanism for shifting the tax liability of the employer to each individual responsible for the nonpayment." *Fiataruolo*, 8 F.3d at 938, *citing* Edward A. Nolfi, *Annotation, When Are Persons Other than Owners, Directors, Officers and Employees Potentially Liable for Penalties Under IRC § 6672 (26 USCS § 6672), Concerning Failure to Collect and Pay Over Tax*, 84 A.L.R. Fed. 170, 177 (1987). Section 6672 is therefore "a vital collection tool that cuts through an employer's organizational structure and allows the IRS to impose liability directly and individually on those persons responsible for the tax delinquency." *Fiataruolo*, 8 F.3d at 938; *Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed.Cir.1984).

■ In pertinent part, Section 6672 provides that "[a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who wilfully fails to collect such tax, or truthfully ac-

count for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof shall ... be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over." 26 U.S.C. § 6672(a).[1]

### Requirements of Section 6672

 Under Section 6672, an individual may be held liable for unpaid withholding taxes if: (1) he or she is a "responsible person" for collection and payment of the employer's trust fund withholding taxes, *see United States v. McCombs*, 30 F.3d 310, 317 (2d Cir.1994); *Fiataruolo*, 8 F.3d at 938; *Godfrey*, 748 F.2d at 1574 & n. 4; and (2) he or she "willfully" failed to comply with the statute. *McCombs*, 30 F.3d at 317; *Fiataruolo*, 8 F.3d at 938; *Hochstein v. United States*, 900 F.2d 543, 546 (2d Cir.1990), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2967, 119 L.Ed.2d 587 (1992). It is well settled that an IRS assessment under section 6672 is presumptively correct, however, and the person against whom the IRS assesses a Section 6672 tax penalty has the burden of disproving, by a preponderance of the evidence, the existence of one of these two elements. *McCombs*, 30 F.3d at 318 ("In the context of section 6672, however, courts have extended the presumption of correctness not merely to the amount of the assessment itself but also to the existence of the two elements, responsibility and willfulness, that underlie the imposition of this type of tax liability"); *see also United States v. Rem*, 38 F.3d 634, 643 (2d Cir.1994); *Fiataruolo*, 8 F.3d at 938; *Hochstein*, 900 F.2d at 546 (taxpayer "bears the burden of proving by a preponderance of the evidence that one or both of these elements [willfulness and responsibility] is not present"); *Lesser v. United States*, 368 F.2d 306, 310 (2d Cir.1966) (en

banc); *United States v. Lease*, 346 F.2d 696, 701 (2d Cir.1965); *Rizzuto v. United States*, 889 F.Supp. 698, 704 (S.D.N.Y. 1995) (burden of proof is on the taxpayer; IRS is presumed to be correct); *Skouras v. United States*, 854 F.Supp. 962, 971 (S.D.N.Y.1993) (tax assessment pursuant to section 6672 creates a prima facie case of liability).

### Responsible Person

With respect to the first prong of the test, "courts generally take a broad view of who qualifies as a responsible person." *Rem*, 38 F.3d at 642; *see also Fiataruolo*, 8 F.3d at 938–39; *Denbo v. United States*, 988 F.2d 1029, 1032 (10th Cir.1993); *Barnett v. IRS*, 988 F.2d 1449, 1454 (5th Cir. 1993). Thus, "determination of responsibility is based upon the individual's 'status, duty and authority' to insure compliance with the employer's tax withholding obligations," *Fiataruolo*, 8 F.3d at 939; *Barton v. United States*, 988 F.2d 58, 59 (8th Cir.1993); *Raba v. United States*, 977 F.2d 941, 943 (5th Cir.1992), and the "core question 'is whether the individual has *significant control* over the enterprise's finances.'" *Fiataruolo*, 8 F.3d at 939, *citing Hochstein*, 900 F.2d at 547 (emphasis added); *see also McCombs*, 30 F.3d at 319.

 A person does not have to be a shareholder, a director, or an officer of a corporation to be responsible under the statute. *Hochstein*, 900 F.2d at 545; *Caterino*, 794 F.2d 1, 6 & n. 1 (1st Cir.1986); *In re Bourque*, 153 B.R. 87 (Bankr. D.Mass.1993); *Hanshaw v. United States*, 94 B.R. 753 (Bankr.M.D.Fla.1988). Moreover, in the Second Circuit, liability as a responsible person under Section 6672 is predicated upon the existence of significant, as opposed to absolute, control of the corporation's finances. *See Fiataruolo*, 8

---

1. Liability under section 6672 is not limited to those individuals in a position to perform *each* of the three duties imposed by statute: collecting, truthfully accounting for, and paying over the trust fund taxes. A person who is in a position to perform even one of the

three duties may be found liable for the unpaid taxes under section 6672. *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978); *Brown v. United States*, 591 F.2d 1136, 1140 (5th Cir.1979).

F.3d at 939 ("[T]his need for a responsible party to have significant control does not, at least in this Circuit, translate into a requirement of absolute authority."); *see also Hochstein,* 900 F.2d at 547. Rather, the term "significant control" encompasses "all those connected closely enough with the business to prevent the [tax] default from occurring." *Fiataruolo,* 8 F.3d at 939; *Bowlen,* 956 F.2d at 728. Thus, to be held responsible under Section 6672, the person need not have the final word on which creditors are to be paid or how funds are to be allocated. *Fiataruolo,* 8 F.3d at 939; *Barton v.. United States,* 988 F.2d 58, 59 (8th Cir.1993).

■ Significant control may also be shared by several people within a company, all of whom may be found liable for a withholding tax delinquency. *See Rem,* 38 F.3d at 642; *Fiataruolo,* 8 F.3d at 939; *Kinnie v. United States,* 994 F.2d 279, 283 (6th Cir.1993); *Roth v. United States,* 567 F.Supp. 496, 498–99 (E.D.N.Y.1983), *aff'd,* 742 F.2d 1434 (2d Cir.1984). One need not be the "most responsible" person to be liable under Section 6672, *Hochstein,* 900 F.2d at 547; *Gephart,* 818 F.2d at 476, and need not have day-to-day control over corporate affairs. *See Purcell v. United States,* 1 F.3d 932, 937 (9th Cir.1993) (even if "an individual's day-to-day function in a given enterprise is unconnected to financial decisionmaking or tax matters" he is still responsible as long as he has "the authority to pay or to order the payment of delinquent taxes"); *Rizzuto v. United States,* 889 F.Supp. 698, 704 (S.D.N.Y. 1995).

■ Moreover, the authority to pay or order the payment of delinquent taxes may not be delegated to others in order to avoid liability. *Fiataruolo,* 8 F.3d at 939; *Hornsby v. IRS,* 588 F.2d 952, 953–54 (5th Cir.1979); *see also Rizzuto,* 889 F.Supp. at 704 ("A responsible person cannot absolve himself of liability merely by delegating this duty to another person."). The inquiry under Section 6672 "focuses on whether an individual *could have* exerted influence,

and delegation or avoidance of duties will not deflect its scope." *Fiataruolo,* 8 F.3d at 939 (emphasis added); *see also Mazo v. United States,* 591 F.2d 1151, 1157 (5th Cir.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); *Schwinger v. United States,* 652 F.Supp. 464, 469–70 (E.D.N.Y.1987). Indeed, "the purpose of the statute would be thwarted, just by compartmentalizing responsibilities within a business (however small) and adopting a 'hear no evil—see no evil' policy." *Wright v. United States,* 809 F.2d 425, 427 (7th Cir.1987).

■ Courts apply a number of factors to determine whether an individual has the requisite control over an enterprise to be found a responsible person under the statute. Specifically, courts have examined whether the person: (1) is an officer or member of the board of directors; (2) owns shares or possesses an entrepreneurial stake in the company; (3) is active in the management of day-to-day affairs of the company; (4) has the ability to hire and fire employees; (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid; (6) exercises control over daily bank accounts and disbursement records; and (7) has check-signing authority. *Fiataruolo,* 8 F.3d at 939; *see also United States v. Sotelo,* 436 U.S. 268, 280 n. 13, 98 S.Ct. 1795, 56 L.Ed.2d 275 (1978); *Rem,* 38 F.3d at 642; *Hochstein,* 900 F.2d at 547; *Caterino v. United States,* 794 F.2d 1, 6 (1st Cir.1986); *Monday v. United States,* 421 F.2d 1210, 1214 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970); *Schwinger v. United States,* 652 F.Supp. 464 (E.D.N.Y.1987); *Simpson v. United States,* 664 F.Supp. 43, 46 (E.D.N.Y.1987); *Silberberg v. United States,* 524 F.Supp. 744, 747 (E.D.N.Y.1981); *In re: Beishline,* 26 B.R. 200 (Bankr.W.D.N.Y.1982). A person need not hold any particular position in a business, however, and need not actually exercise authority to be held a responsible party under section 6672. *See Fiataruolo,* 8 F.3d at 939. Rather, "the

question of control over the employer's finances must be answered in light of the *totality of the circumstances;* no one factor is determinative." *Fiataruolo,* 8 F.3d at 939 (emphasis added); *see also Rem,* 38 F.3d at 642.

*Willfulness*

 Section 6672(a) imposes no liability on a responsible person unless the failure to collect, account for or remit the withholding taxes was "willful." *Rem,* 38 F.3d at 642. "A person willfully fails to pay withholding taxes within the meaning of section 6672 when he pays other creditors with knowledge that withholding taxes are due." *Hochstein,* 900 F.2d at 548; *see also Kalb,* 505 F.2d at 511; *Rizzuto,* 889 F.Supp. at 705. In other words, willfulness is established by a "responsible person's use of funds or his knowledge of the use of funds for payments to other creditors after he is aware of the failure to pay the withholding tax." *Bowlen,* 956 F.2d at 729; *Ruth v. United States,* 823 F.2d 1091, 1094–95 (7th Cir.1987); *Rizzuto,* 889 F.Supp. at 705. An individual's bad purpose or evil motive in failing to collect and pay the taxes "properly play no part in the civil definition of willfulness." *Hochstein,* 900 F.2d at 548; *Monday,* 421 F.2d at 1216; *Rizzuto,* 889 F.Supp. at 705.

 A reckless disregard for whether taxes are being paid constitutes willful conduct. *See McCombs,* 30 F.3d at 320 ("willfulness may be established by a showing of gross negligence involving a known risk of violation"), *citing Ruth,* 823 F.2d at 1094; *see also Kalb,* 505 F.2d at 511; *Rizzuto,* 889 F.Supp. at 705. For this purpose, recklessness is the equivalent of gross negligence and is established if the party "(a) knew of the company's obligation to pay withholding taxes, and (b) knew that company funds were being used for other purposes instead." *Rem,* 38 F.3d at 643; *see also Hochstein,* 900 F.2d at 548; *United States v. Running,* 7 F.3d 1293, 1298 (7th Cir.1993) ("a responsible person acts willfully when he permits funds of the corpo-

ration to be paid to other creditors when he is aware that withholding taxes due to the government have not been paid."); *Rizzuto,* 889 F.Supp. at 705.

 Willful conduct "also includes failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the Government." *McCombs,* 30 F.3d at 320, *citing Kalb,* 505 F.2d at 511; *see also Thomsen v. United States,* 887 F.2d 12, 18 (1st Cir.1989); *Wright v. United States,* 809 F.2d 425, 427 (7th Cir.1987) (a responsible person is liable if he clearly ought to have known that there was a grave risk that withholding taxes were not being paid and if he was in a position to find out for certain very easily). A mere belief that withholding taxes were being paid is not sufficient, if the belief was not reasonable given the prevailing circumstances. *United States v. Rem,* 38 F.3d 634, 643 (2d Cir.1994). Moreover, "[a] responsible person cannot shield himself from liability by burying his head in the sand. Thus, a responsible person who acts with a reckless disregard for obvious or known risks will be considered to have acted willfully for purposes of § 6672." *First America Bank and Trust Co. v. United States,* 1979 WL 1292, 79–1 USTC ¶ 9205 at 86,370 (W.D.Okla.1979), *citing Sorenson v. United States,* 521 F.2d 325 (9th Cir.1975); *Kalb v. United States,* 505 F.2d 506, 510 (2d Cir.1974), *cert. denied,* 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *Monday v. United States,* 421 F.2d 1210, 1214 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970); *Teel v. United States,* 529 F.2d 903, 905 (9th Cir. 1976); *see also Wright v. United States,* No. 88–CV–3743, 1995 WL 838984 at *13 ("Plaintiff cannot simply stick his head in the sand and attempt to cast blame on others for his failure to discharge basic duties for the corporation that he had the authority and responsibility to control."), *citing Thomsen v. United States,* 887 F.2d 12, 17–18 (1st Cir.1989).

In short, failures are "willful" within the meaning of section 6672(a) if they are "voluntary, conscious and intentional—as opposed to accidental—decisions not to remit funds properly withheld to the Government." *Rem*, 38 F.3d at 643, *citing Kalb*, 505 F.2d at 511.

### Findings of Fact

The government seeks to hold each of the four plaintiffs liable as responsible persons who willfully failed to pay Nutmeg's delinquent 941 taxes. The plaintiffs contend that Russell Junior alone is a responsible person liable for Nutmeg's unpaid taxes. The resolution of these consolidated cases turns on the following factual findings.

#### Assessments and Payments of Tax

Sometime before July 1990, Nutmeg began to fall behind in its payments of federal income tax ("1120 taxes") and employee withholding and social security taxes ("941 taxes"). The 941 taxes include both a component withheld from Nutmeg's employees' paychecks to be held in trust until payment to the IRS ("trust portion") and a matching component required to be paid by the employer ("non-trust portion").

In August 1990, Russell Senior, Russell Junior and their counsel, J. Michael Sulzbach, met with Howard Smith and Paul Sipples of the Internal Revenue Service regarding delinquent withholding taxes of Nutmeg. At that meeting, Nutmeg proposed to bring the delinquencies in 941 taxes current by paying $20,000 every two weeks. The parties dispute whether the IRS agreed that these payments would be credited first toward trust fund taxes owed or whether the IRS could credit them as it saw fit. Russell Junior testified that the understanding was that the $20,000 payments Nutmeg agreed to make every two weeks were "[t]o catch up on the 941 taxes." (Nov. 30 Tr. at 26, 27–28.) The court finds that an agreement was reached,[2] but also that it was breached by Nutmeg's failure to remain current on its tax liabilities as they accrued. (Nov. 30 Tr. at 65.) Nutmeg's obligation to remain current on required quarterly and estimated tax payments as they came due was part of the parties' understanding, and its failure to remain current would constitute a breach. (Nov. 30 Tr. at 86, 89–90.) Accordingly, the agreement reached by the parties concerning how Nutmeg payments were to be applied has no effect on whether the payments actually made were properly applied by the IRS.

The Secretary of the Treasury made assessments in accordance with 26 U.S.C. § 6672 against each of the plaintiffs with respect to the unpaid trust fund tax liability of Nutmeg. Those assessments were made in the following amounts with respect to the following calendar quarters:

| | Assessment Amount | Calendar Quarter |
|---|---|---|
| | $ 29,010 | 12/31/89 |
| | 48,539 | 3/31/90 |
| | 72,975 | 6/30/90 |
| | 67,819 | 9/30/90 |
| Subtotal | $218,343 | |
| | $ 13,654 | 12/31/90 |
| | 11,602 | 3/31/91 |
| TOTAL | $243,599 | |

On or about September 18, 1991, Nutmeg filed amended corporate income tax returns for the tax years 1987, 1988, and 1989. Nutmeg claimed and was eventually credited with net operating loss carrybacks that affected its tax liabilities for the years 1987 through 1989. In connection with the net operating loss computation,

2. There was no credible, unequivocal testimony that an agreement was not reached. IRS agent Smith testified that there was an "interim agreement" consistent with the plaintiffs' understanding. (Nov. 30 Tr. at 132.) No written record of the meeting was available, because Smith lost his file relating to Nutmeg.

The court finds an agreement existed in large part because IRS agent Falk testified that early payments by Nutmeg were applied first toward payment of 941 taxes, which would have been contrary to IRS procedure absent an agreement to apply payments in that manner. (Nov. 30 Tr. at 202–05.)

Nutmeg filed for and received tax credits in the following amounts: 1987—$32,815; 1988—$50,366 and $6,544; and 1989—$45,-372. Refunds in smaller amounts for 1987 and 1988, but for the full tax credit amount for 1989, were applied to Nutmeg's outstanding tax liabilities. The smaller amounts of tax refunded reflected the fact that the IRS will not refund taxes in amounts greater that the total tax actually paid for the periods at issue.

Due in part to these credited refunds of income tax, the IRS has reduced the outstanding assessments against each of the Mahlers to the following:

| Assessment Amount | Calendar Quarter |
|---|---|
| $ 23,213 | 12/31/89 |
| 39,924 | 3/31/90 |
| 53,573 | 6/30/90 |
| 66,958 | 9/30/90 |
| Subtotal $183,668 | |
| $ 13,654 | 12/31/90 |
| 4,439 | 3/31/91 |
| TOTAL $201,761 | |

On various dates in 1996 and 1997, the IRS prepared Certificates of Assessments and Payments ("CAPs") for Nutmeg.[3] Each of the plaintiffs paid a portion of assessment[4] to the IRS and filed a claim for refund and for abatement of all trust fund withholding taxes assessed against him or her. The claims for refund and abatement were denied by the Hartford District Director of the IRS. *Id.* Thereafter, the Mahlers filed these actions.

*The Taxpayer*

Nutmeg was a corporation organized under the laws of the State of Connecticut. (Stip. of Fact no. 1.) Nutmeg operated convenience store/gasoline stations in Connecticut from 1983 through 1991. (Stip. of Fact no. 2.) During the period of time relevant to this case, Nutmeg was owned by Stelle, Russell Junior, and William. Stelle served as president and treasurer of Nutmeg; Russell Junior was Vice President, and William was Secretary. Russell Senior never held an ownership interest in nor served as an officer of Nutmeg. Each of the plaintiffs was on the payroll of Nutmeg throughout the period at issue in this case, and each drove a company car. (Nov. 30 Tr. at 51–52.)

Nutmeg filed a petition under Chapter 11 of the United States Bankruptcy Code on January 14, 1991. (Stip. of Fact no. 3.) The case was converted to a Chapter 7 case in November 1991. *Id.*

*The Plaintiffs*

Each of the plaintiffs' relationship to and involvement with Nutmeg is described below.

A. *William Mahler*

William is the son of Russell Senior and Stelle. He joined Nutmeg following his graduation from New Hampshire College in 1985. (Nov. 30 Tr. at 42, 158.) William served as secretary of Nutmeg (Complaint, no. 395cv2732, ¶ 3), and was a 25% owner of the company. (Nov. 30 Tr. at 159.) He was a signatory on Nutmeg's bank accounts (Complaint, no. 395cv2732, ¶ 4), but did not sign company checks. (Nov. 30 Tr. at 159.) He provided a personal guarantee to at least one merchant doing business with Nutmeg. (Dec. 1 Tr. at 25.)

William Mahler's primary responsibilities at Nutmeg involved maintenance of Nutmeg's stores and the equipment used at those stores. (*Id.* at 42–43.) He hired and fired maintenance personnel, but was not involved in financial decisions of the

---

3. The CAPs were admitted into evidence as pages 19 through 45 of Exhibit 519.

4. The United States has admitted to the following payments in its proposed findings of fact and conclusions of law: William paid $2,096.80; Stelle paid $776.23; Russell Junior paid $34.92; and Russell Senior paid $17.99. After crediting the payments made by each of the plaintiffs, the IRS claims the following amounts due from each plaintiff: Russell Senior $201,743; Stelle $200,984; Russell Junior $201,726; William $199,664.

company. (*Id.*) William had no involvement in the payment of taxes on behalf of Nutmeg, (*id.* at 160), was not aware that the company's taxes had not been paid, and was not aware that his father and brother were meeting with the IRS about Nutmeg's taxes. (*Id.* at 164.)

William did benefit from the family's use of corporations to pay personal expenses and to hold property. Until Nutmeg filed for bankruptcy, William simply gave his personal credit card bills to Nutmeg for payment. (*Id.* at 165.) Granite Hill Development Corporation, an entity that William solely owns, in turn owns the house in which he lives. (*Id.* at 160–61.) When asked why his home is owned by a corporation, William responded that he "was always taught [by his father] that's the way you would do it." (*Id.* at 161.)

### B. *Stelle Mahler*

Stelle is married to Russell Senior and is the mother of Russell Junior and William. Stelle was president and treasurer of Nutmeg, (Nov. 30 Tr. at 14), and was president of all of the family companies that owned the real estate leased by Nutmeg for its stores. (*Id.* at 47.) She claims that these were honorary titles. (*Id.* at 169.) Stelle owned 50% of Nutmeg, as well as each of the other family companies. She was the principal investor in Nutmeg, having invested about one million dollars in the company. (*Id.* at 68.) These investments were made without formal loan documentation and Stelle received a dividend from the company when "[s]he needed money." (*Id.* at 68.) Stelle provided personal financial statements and personal loan guarantees to Connecticut Bank & Trust for each of the several loans that bank made to Nutmeg. (Dec. 1 Tr. at 34–37.)

Stelle worked occasionally in the Nutmeg office, putting sales information into the company computer. Stelle received a salary from Nutmeg. In January 1990, when she "retired" from Nutmeg, she received a raise of almost 50% because she

"needed it for living expenses." (Nov. 30 Tr. at 179.) Stelle had check-writing authority for Nutmeg, but she rarely signed checks. (*Id.* at 44–45.)

Stelle did not hire or fire employees and did not make day-to-day decisions about which company creditors would be paid. (*Id.* at 41–42, 170.) Stelle was nevertheless in a position both to pay and to order others to pay particular debts, including the delinquent taxes owed by Nutmeg. As president, largest stockholder, and primary source of operating funds for Nutmeg, Stelle had both the actual authority and the practical ability to cause payment of specific creditors. She was aware that Nutmeg had fallen behind in the payment of its tax obligations because the issue "would come up in polite conversation." (*Id.* at 170.) She was also aware of an employer's obligation to withhold taxes from employee wages, having done so routinely in her past business experience. (*Id.* at 173.) Stelle had the actual authority to decide which obligations of Nutmeg would be paid and which would not.

### C. *Russell Junior*

Russell Junior is the son of Russell Senior and Stelle. Russell Junior founded Nutmeg soon after his 1983 graduation from Plymouth State College. He was at all times Vice President of Nutmeg; he was also secretary of the corporation until his brother, William, graduated from college and joined the family business. Russell Junior owned 25% of Nutmeg. (Nov. 30 Tr. at 49.) Russell Junior was also vice president and 25% owner of all of the family companies that owned the properties that Nutmeg leased for its stores. (*Id.* at 48–49.) Russell Junior served on Nutmeg's board of directors, which met informally when he "got together" with Stelle and William. (*Id.* at 50.) Russell Junior "oversaw the whole operation" at Nutmeg. (*Id.* at 15.) Russell Junior claims that he and the company's accountant were the only persons who reviewed bank accounts and payment records. (*Id.*

at 43.) Russell Junior had check-writing authority for the company and hired and fired company store managers. He claims that he alone decided which company debts would be paid. (*Id.* at 45–46.) He provided a personal guarantee to at least one merchant doing business with Nutmeg. (Dec. 1 Tr. at 25.)

Russell Junior used Nutmeg to pay many of his personal expenses and used other corporations to purchase and hold personal and real property on his behalf. Russell and William received large salary increases from Nutmeg after the company went into bankruptcy. Once the company was in bankruptcy, Nutmeg "didn't pay expenses for us anymore but we still had the expenses we had to get paid somehow, so I gave William or myself raises." (*Id.* at 63.) These expenses for "credit cards, dinners, normal expenses that anyone has," (*id.* at 64), had no business purpose. (*Id.*) Similarly, Golden Meadows, "one of [Russell Junior's] holding companies," (*id.* at 54), purchased a Jaguar automobile for Russell Junior and also purchased the condominium in which Russell Junior and his wife lived. Funds for the purchase of the Jaguar by Golden Meadows came from "a personal account of [Russell Junior's] with a corporate name" on it. (*Id.* at 55.) Russell Junior wrote at least two Nutmeg corporate checks to his wife, one of which was out of a Nutmeg debtor-in-possession account. (*Id.* at 75–76.) These payments had no legitimate business purpose.

Russell Junior also used a bank account in the name of Farm Supply Corporation to pay bills of Nutmeg. He did this because money had been taken out of the Nutmeg accounts to pay tax warrants and he did not want that to happen again. Russell Junior testified that, "when you're writing checks all the time, it's easier to have a couple different accounts working so that if you're overdrawn on one account one day, the other one still has money in it and it just is easier to run a business that way, especially when it was in trouble like [Nutmeg] was." (Dec. 22 Tr. at 36.)

All of the plaintiffs have agreed that Russell Junior is a responsible person with respect to payment of trust fund taxes for Nutmeg. The plaintiffs also agree that, if there was a failure to pay federal withholding taxes, Russell Junior's failure to pay was willful.

### D. *Russell Senior*

Russell Senior is married to Stelle and is the father of Russell Junior and William. Russell Senior was a "consultant" to Nutmeg beginning at the time of the company's formation. (Dec. 22 Tr. at 12.) He attended meetings of local planning and zoning commissions when Nutmeg's interests were at issue, and discussed building requirements and construction with town engineers and building contractors. (*Id.*) Russell Senior met with Connecticut Bank & Trust, along with Russell Junior and Stelle, in an effort to obtain early bank financing for the company. (Dec. 1 Tr. at 33.)

Russell Senior was never an officer of Nutmeg and never held an ownership position in the company in his own name. He had no check-writing authority for the corporation. Russell Senior did not make hiring and firing decisions and had no formal role in deciding what debts of the company would be paid. (Nov. 30 Tr. at 43–44.) Russell Senior was always on Nutmeg's payroll, and he received the same salary as Russell Junior in 1989. (*Id.* at 57–58.) He later was the highest paid person on Nutmeg's payroll. (*Compare* Ex. 513A *with* Nov. 30 Tr. at 61.) Russell Senior drove a company car.

In August 1990, Russell Senior, Russell Junior and a lawyer representing Nutmeg attended a meeting with Howard Smith and Paul Sipples of the IRS. (Nov. 30 Tr. at 27.) The purpose of the meeting was to discuss how Nutmeg could catch up on the payment of 941 taxes. (*Id.*) He had previously contacted IRS officer Howard Smith and told Smith that he was dealing with

the IRS office in Andover regarding Nutmeg's tax issues.

Although Russell Senior denies it, the court finds that he met with cigarette and candy distributors and wholesalers on behalf of Nutmeg. Included among these meetings were meetings between Russell Senior and Cary Mantano and Antonio Vanacore. Russell Senior brought these merchants checks to replace Nutmeg checks that had been returned for insufficient funds. (Dec. 1 Tr. at 16, 24.)

Russell Senior testified that he had resolved an outstanding financial obligation to the City of New York. Exhibit 530 demonstrates that a significant amount of restitution is still due and owing. Thus, Russell Senior had an incentive to avoid taking an ownership position in Nutmeg.

Notwithstanding the fact that he did not hold a formal officer position or ownership interest in Nutmeg, Russell Senior had the practical ability to cause specific creditors of the company to be paid. Russell Senior was directly involved in the financial affairs of Nutmeg. He attended the initial meeting with Connecticut Bank & Trust to obtain financing, he met with distributors and wholesalers to discuss credit terms, he personally delivered checks to replace Nutmeg checks that had been returned, and his handling of tax and financial affairs for Stelle indicates that he used her as a proxy for his own financial dealings. All of the other Mahlers deferred to Russell Senior in financial matters; he undoubtedly had the ability to cause particular creditors of the company to be paid.

*Plaintiffs' Challenges to the Tax Assessments*

As noted above, it is well settled that the IRS's tax assessments are presumed to be correct and it is the taxpayer who must rebut this presumption. *See McCombs*, 30 F.3d at 318; *Rem*, 38 F.3d at 643; *Fiata-*

*ruolo*, 8 F.3d at 938; *Hochstein*, 900 F.2d at 546; *Lesser*, 368 F.2d at 310; *Lease*, 346 F.2d at 701; *Rizzuto*, 889 F.Supp. at 704 (S.D.N.Y.1995) (burden of proof is on the taxpayer; IRS is presumed to be correct); *Skouras*, 854 F.Supp. at 971 (tax assessment pursuant to section 6672 creates a prima facie case of liability); *Curley v. United States*, 791 F.Supp. 52, 54 (E.D.N.Y.1992). Indeed, only in rare cases can this presumption be overcome by destroying the assessment's foundation. *Curley*, 791 F.Supp. at 54, *citing United States v. Schroeder*, 900 F.2d 1144, 1148 (7th Cir.1990).

Here, plaintiffs raise several challenges to the IRS-prepared tax assessments for Nutmeg. They claim that: (1) the IRS failed to credit all payments made by Nutmeg; (2) the IRS credited Nutmeg with an amount less than a payment actually made; (3) there are errors in the accounting for credits as a result of tax refunds due Nutmeg; and (4) penalties and interest were improperly accrued by the IRS. Each of these challenges is addressed below.

### 1. *Failure to Credit All Payments* [5]

Plaintiffs specifically claim that the IRS failed to credit two payments made on behalf of Nutmeg toward its outstanding tax liability: an October 19, 1990 payment of $20,000.00 and a December 28, 1990 payment of $20,053.85. They also claim that payments made against various tax warrants were not credited by the IRS.

Copies of several cashier's checks obtained by Nutmeg and forwarded to the IRS were introduced into evidence. (Exs. 5D, 5E, 5F, 5G, 5H, 5J.) The IRS received and credited each of these checks, except for one in the amount of $20,000, dated October 19, 1990. (Ex. 5E.) Russell Junior testified that this check was delivered to

---

5. In addition to the specific claims discussed in this section, plaintiffs claim generally that the have overpaid the IRS. They offer an analysis by Nutmeg's accountant as support for this proposition. (Ex. 18.) The court discounts the analysis reflected in exhibit 18 because it was based upon faulty methodology, includes payments made to state tax authorities, and double counts various payments made to the IRS.

the IRS. The CAPs do not reflect a credit for $20,000 on or about October 19, 1990.

In light of the significant evidence of juggling of accounts and funds that the plaintiffs and their various corporations engaged in, the court is unable to credit the testimony that the October 19, 1990 check was delivered to the IRS or to find from the existence of a photocopy of the check that it was actually received and processed by the IRS. The court has not been provided with the additional evidence it needs to make the finding the plaintiffs request. There was no evidence that the cashier's check was ever cashed; the back of the check was not offered or admitted into evidence. Either party could have subpoenaed records from Connecticut Bank & Trust to prove the negotiation of the check or the fact that negotiation never occurred. The checking account records for Nutmeg and related entities for the relevant period were not introduced into evidence, with the exception of the December 1990 records for Farm Supply Corp. (Ex. 20.) Thus, the court is unable to confirm whether or not Nutmeg or a related entity was credited with the amount of an unnegotiated $20,000 cashier's check. In short, the evidence regarding the October 19, 1990 check for $20,000 is inconclusive. Because the plaintiffs bear the burden of proof on this point, the court finds that the $20,000 payment was never made.

The evidence shows that, on or about December 28, 1990, Russell Junior wrote a check on the account of Farm Supply Corporation in the amount of $20,053.85 payable to Connecticut Bank & Trust. (Ex. 12, p. 10; Ex. 20, p. 5; Dec. 22 Tr. at 35.) Plaintiffs contend that the Farm Supply Corporation check was used to purchase a certified check in the amount of $20,053.85, which Russell Junior delivered to Howard Smith of the IRS. (Nov. 30 Tr. at 22–23; Dec. 22 Tr. at 33–34.) Russell Junior claims that Nutmeg did not have to pay any fees in order to obtain a cashier's check, so the cashier's check obtained was in the full amount of $20,053.85, and that amount should have been credited as a payment made by Nutmeg.

Although the plaintiffs produced a number of cashier's checks, there was no copy of a cashier's check in the amount of $20,053.85. A check in that amount was introduced into evidence (Ex. 12, last page), but it was drawn on account of Farm Supply Corp. (*See* Ex. 20, p. 5.) A cashier's check dated December 28, 1990 in the amount of $20,000 was also introduced into evidence. (Ex. 5–J.) Plaintiffs certainly have not proven that Nutmeg purchased two sizable cashier's checks on the same day, one for $20,053.85 and one for $20,000. The only bank records showing a check used to purchase a cashier's check on December 28, 1990 was the Farm Supply Corp. check in the amount of $20,053.85. The government suggests that this amount reflects the purchase of a $20,000 cashier's check and the payment of fees in connection with obtaining that check. The court need not resolve what the extra $53.85 represents. The court finds from all the evidence that the $20,053.85 check was used to purchase a $20,000 cashier's check payable to the IRS, and that an additional payment in the amount of $20,053.85 was not made to the IRS on behalf of Nutmeg.

A payment of $20,000 as of December 28, 1990 was reflected on the CAPs. Exhibit 519 shows two payments dated December 28, 1990, that total $20,000. The first payment appears on page 28 of that exhibit, in the amount of $6,921.40; the second payment appears on page 30 of the exhibit, in the amount of $13,078.60. Accordingly, the court finds that the disputed $20,000 payment of December 28, 1990 was, in fact, credited by the IRS.

The evidence demonstrated that the tax warrants issued against Nutmeg were state tax warrants and that any payments against these warrants went to state tax authorities, not to the IRS. Exhibit 528 provides conclusive evidence that the tax warrant payments reflected in the debit notices issued by CBT against Nutmeg

reflected payments of state tax, not federal tax.

### 2. *Credit of Amount Less than Actually Paid*

Nutmeg sent the IRS a check for $50,000 on or about January 19, 1990. (Ex. 529.) It is undisputed that the IRS credited this check for only $5,000. (Dec. 1 Tr. at 43, 46–47, 76.) To the extent that plaintiffs claim that Nutmeg was under credited for this payment, that argument has no factual basis. There was no evidence presented that Nutmeg actually paid out $50,000 but was credited with only $5,000. Because the check was processed as a $5,000 check, the court finds that only $5,000 was debited from Nutmeg's checking account. The IRS's processing error left Nutmeg with the balance of $45,000. Accordingly, a payment of $50,000 was not actually made, even though a check for $50,000 was sent to the IRS.

### 3. *Errors in Accounting for Credits*

In 1991, Nutmeg applied for tax refunds with respect to its corporate income tax liabilities for tax years 1987 through 1989. Nutmeg applied for and was allowed net operating loss ("NOL") credits that were carried back to the years 1987, 1988 and 1989. Although Nutmeg's claimed NOL credits were allowed, the IRS granted Nutmeg credits in smaller amounts to reflect the fact that an NOL credit is limited to the amount of tax actually paid for the period at issue. For the 1987 tax year, Nutmeg claimed an NOL of $32,815, and was credited with overpayment of tax of $21,580. (Ex. 519 at 19, 39.) For the 1988 tax year, Nutmeg claimed an NOL of $56,-910, and was credited with overpayment of tax of $6,628. (Ex. 519 at 21, 30, 39.) For the 1989 tax year, Nutmeg claimed an NOL of $45,372, and was credited with overpayment of tax in that amount. (Ex. 519 at 23, 34, 35, 36, 39.)

Most of the plaintiffs' complaints about the treatment of credits, interest and penalties by the IRS as a result of the NOL carrybacks are without merit. Plaintiffs did, however, identify one error in the CAPs that resulted from the transfer of credits among the "modules" reflecting credits and debits for various types of taxes by tax period. The IRS under credited Nutmeg in the amount of $735 when transferring credits relating to the 1987 NOL carryback. (Nov. 30 Tr. at 195–96.)

### 4. *Penalties and Interest Improperly Accrued*

Plaintiffs suggest that the IRS's assessments of taxes owed by Nutmeg are overstated as a result of the way in which the IRS applied the credits for the NOL carrybacks. First, plaintiffs note that there was a months-long delay between the application for the NOL credits and the reflection of credits on the CAPs. (*E.g.*, Nov. 30 Tr. at 197.) Second, plaintiffs suggest that there was a significant delay in posting accrued interest and penalties to the CAPs. That delay was the result of the difference between assessed interest and penalties and accrued interest and penalties. (Nov. 30 Tr. at 209.) Plaintiffs have not shown that any interest or penalty calculations were actually in error, despite the fact that these amounts were posted to the CAPs at dates long after they started accruing.

Plaintiffs have not even attempted to show how, if at all, the amounts shown for penalties and interest on the CAPs are incorrect as a result of either of these issues. They have not presented either an alternative calculation of penalties and interest or an identification of actual errors in the IRS calculations. Accordingly, plaintiffs have failed to prove that the IRS calculations are erroneous.

### *Analysis of Individual Liability*

Because section 6672 tests substance rather than form, *Godfrey,* 748 F.2d at 1576; *Simpson,* 664 F.Supp. at 47, cases under the statute are particularly dependent upon their facts. *Simpson,* 664 F.Supp. at 47; *Abramson v. United States,*

48 B.R. 809, 811 (E.D.N.Y.1985). Bearing in mind that the plaintiffs had the burden of proof on these issues, the court now applies the specific facts of this case to determine the liability each plaintiff.

*William Mahler*

1. *Responsible Person*

 ■ Although William followed the family habit of using corporations to shelter personal assets and to pay personal expenses, he was not sufficiently involved in the finances of Nutmeg to qualify as a responsible person. Neither his officer position nor his ownership position are sufficient to make him a responsible person. Nor is the fact that he had signatory power over Nutmeg's checking account. The court accepts William's testimony that he was not involved in any way with the payment of taxes or other bills of Nutmeg. Moreover, William was not directly or indirectly an investor in Nutmeg. He did not attend meetings with lenders. Unlike other of the plaintiffs, William had no practical authority over the payment of creditors of Nutmeg.

2. *Willfulness*

 Even if William could be held to be a responsible person, he did not act wilfully. William was not aware that Nutmeg's taxes had not been paid and was not aware that his father and brother were meeting with the IRS to discuss Nutmeg's taxes.

*Stelle Mahler*

1. *Responsible Person*

 ■ Stelle is a responsible person. She had tremendous financial authority within the corporation. No one was a larger investor than she; no one owned more stock; and no one had more formal authority within Nutmeg than she did as president and largest shareholder. These facts are sufficient to make Stelle a responsible person. *See, e.g., Denbo v. United States,* 988 F.2d 1029 (10th Cir.1993) (finding that co-owner was "responsible person" was supported by evidence that co-owner had check signing authority, owned 50% of stock, and was responsible for infusing capital into the corporation—often pledging his own assets as collateral, even though other co-owner handled financial affairs and day-to-day operations; co-owner had effective power to see that taxes were paid); *see also Caterino,* 794 F.2d 1, 6 (by virtue of substantial loans the plaintiff had arranged or guaranteed for the organization, he had become a "dominant force in piloting the course of the company."); *Beishline v. United States,* 26 B.R. 200 (Bankr.W.D.N.Y.1982) (plaintiff was a "responsible person" under Section 6672 where plaintiff was a 50% shareholder in a corporation, vice-president and treasurer, creditor and guarantor of corporation, was authorized to sign corporate checks, had stake in the entrepreneurial success of the corporation and had taken out personal loans which were ultimately for the benefit of the corporation).

 Stelle also had great practical ability over Nutmeg's finances, including the ability to cause creditors to be paid. Stelle received money from Nutmeg whenever she needed it. Indeed, she was paid a salary that increased significantly even after she "retired" from the company. The fact that she did not exercise day-to-day control over the finances of Nutmeg does not undercut the scope of her power to control financial issues when she chose to do so. *See, e.g., Caterino,* 794 F.2d 1, 5–6 ("[F]ailure to exert control over the operations of the company is not sufficient ... to escape liability under Section 6672 ... Congress has chosen to impose responsibility on one who has the *ability* to determine whom a company will or will not pay.") (emphasis added). A responsible person cannot absolve herself of liability merely by delegating this duty to another person. *Rizzuto,* 889 F.Supp. at 704; *Fiataruolo,* 8 F.3d at 939; *Hornsby v. IRS,* 588 F.2d 952, 953 (5th Cir.1979).

 The fact that Stelle claimed her position as president of Nutmeg was "honorary" and the fact that she "retired" in 1990 does

not alter her status as a responsible person. *See, e.g., Roth v. United States,* 567 F.Supp. 496 (E.D.N.Y.1983) (taxpayer was "responsible person" under Section 6672 notwithstanding that he had relinquished the title of president).

### 2. *Willfulness*

■ Stelle was aware of an employer's obligation to withhold taxes from employee wages, having done so routinely in her past business experience. She had loaned her son, Russell Junior, money to pay Nutmeg's taxes. Stelle was also aware that Nutmeg had fallen behind in payment of its tax obligations to the federal government. The combination of her knowledge that taxes were due and payable and her formal and practical authority to cause those taxes to be paid by Nutmeg leaves no room for doubt that Stelle acted wilfully in failing to cause Nutmeg to pay its outstanding tax liabilities.

### *Russell Mahler, Jr.*

### *Responsible Person*

All of the plaintiffs, including Russell Junior, admit that he was a responsible person with respect to Nutmeg's payment of trust fund taxes. This admission is consistent with the evidence admitted at trial.

### *Willfulness*

All of the plaintiffs, including Russell Junior, admit that he acted wilfully with respect to Nutmeg's failure to pay trust fund taxes. This admission is consistent with the evidence admitted at trial.

### *Russell Mahler, Sr.*

### 1. *Responsible Person*

■ Despite the fact that he held no formal officer position at Nutmeg and did not formally own any shares of the company, Russell Senior was deeply involved in financial matters at Nutmeg and had significant practical control over the finances of the company. His lack of formal role stands in stark contrast to the fact that he

was paid as much as, and at times more than, any other employee of Nutmeg. His actual authority over Nutmeg was as great as Russell Junior's. Accordingly, he is a responsible person.

Russell Senior attended the initial meeting with CBT to obtain financing for Nutmeg, he met with the company's distributors and wholesalers to discuss credit terms, he personally delivered checks to replace Nutmeg checks that had been returned for non-payment and assured creditors that they would be paid by Nutmeg. All of the other Mahlers deferred to Russell Senior in financial matters. His practical authority over the finances of Nutmeg cannot be overestimated, and the absence of his formal role is explained by his desire to avoid collection of an outstanding financial obligation to the City of New York. *Cf. Silberberg v. United States,* 524 F.Supp. 744, 747–48 (E.D.N.Y.1981) ("financial godfather" of the corporation held liable under section 6672 notwithstanding a "transparent attempt to downplay his involvement"). Russell Senior undoubtedly had the ability to cause particular creditors of Nutmeg to be paid.

### 2. *Willfulness*

■ Russell Senior was directly involved in the negotiations that Nutmeg had with the IRS over non-payment of its taxes. He attended the August 1990 meeting with the IRS at which the agreement between plaintiffs and the IRS over how Nutmeg's tax payments would be credited was reached. He had previously contacted IRS agent Smith to inform Smith that Russell Senior was dealing with the IRS office in Andover regarding Nutmeg's tax issues. Russell Senior's full involvement in the tax issues of the company make his failure to cause the company to pay the outstanding taxes wilfull.

### *Conclusion*

Judgment shall enter in favor of William Mahler on his claims and against the United States on its counterclaims. William

Mahler is entitled to judgment in the amount of $2,096.80

Judgment shall enter against Stelle Mahler on her claims and in favor of the United States on its counterclaims. An adjustment of $735 must be made to the assessment of tax against Stelle Mahler. Accordingly, the United States is entitled to judgment in the amount of $200,249.

Judgment shall enter against Russell Mahler, Jr. on his claims and in favor of the United States on its counterclaims. An adjustment of $735 must be made to the assessment of tax against Russell Mahler, Jr. Accordingly, the United States is entitled to judgment in the amount of $200,991.

Judgment shall enter against Russell Mahler, Sr. on his claims and in favor of the United States on its counterclaims. An adjustment of $735 must be made to the assessment of tax against Russell Mahler, Sr. Accordingly, the United States is entitled to judgment in the amount of $201,008.

The clerk shall prepare the judgments and shall close these files.