**Dennis RIZZUTO and Richard Katz, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**UNITED STATES of America, Third Party Plaintiff,**

**v.**

**Edward WEISS and John Treglia, Third Party Defendants.**

**No. 92 Civ. 1145 (BDP).**

United States District Court, S.D. New York.

March 18, 1995.

Edward Weiss, Whitestone, NY, pro se.

John J. Gochman, Cronton-on-Hudson, NY, for plaintiffs.

Deborah Yeoh, U.S. Atty.'s Office, New York City, for defendant U.S.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PARKER, District Judge.

This Memorandum constitutes the findings of fact and conclusions of law of the Court after a bench trial on February 14, 15 and 21, 1995 in which the claims of the United States were tried against Edward Weiss.

1. On February 4, 1991, the Internal Revenue Service (the "IRS"), made an assessment against Richard Katz ("Katz") for a 100–percent penalty pursuant to 26 U.S.C. § 6672 (the "100–percent penalty") in the amount of $36,993.08 for unpaid Federal Insurance Contribution Act ("FICA"), and federal withholding taxes (also known as trust fund taxes) for the employees of Promo–Net, Inc. ("Promo–Net") for the first, second and third quarters of 1986 (the "Tax Period").

2. On February 4, 1991, the IRS made an assessment against Dennis Rizzuto ("Rizzuto") for a 100–percent penalty pursuant to 26 U.S.C. § 6672 in the amount of $36,993.08, for unpaid FICA and federal withholding taxes for employees of Promo–Net for the Tax Period.

3. On February 11, 1991, the IRS made an assessment against Edward Weiss ("Weiss") for a 100–percent penalty pursuant to 26 U.S.C. § 6672 in the amount of $36,-993.08 for unpaid FICA and federal withholding taxes for employees of Promo–Net for the Tax Period.

4. The IRS mailed the proper notice of the assessment and a demand for payment to Weiss. Despite the notice of assessment and demand for payment, Weiss has failed to pay the assessed amount.

5. On September 18, 1989, the IRS made an assessment against John Treglia ("Treglia") for a 100–percent penalty pursuant to the 26 U.S.C. § 6672 in the amount of $36,993.08 for unpaid FICA and federal withholding taxes for employees of Promo–Net for the Tax Period.

6. Katz and Rizzuto filed this action on February 18, 1992, seeking a refund of the taxes collected and an abatement of the assessments pursuant to 26 U.S.C. § 6672.

7. On July 6, 1992, the Government filed a counterclaim against Katz and Rizzuto for collection for the unpaid portion of the 100–percent penalty that had been assessed against them. On the same date, the Government filed a third-party complaint against Weiss and Treglia for collection of the 100–percent penalty that had been assessed against them.

8. On September 3, 1993, the Government filed an amended third-party complaint against Weiss and Treglia for collection of the 100–percent penalty that had been assessed against them. On October 29, 1993, the Government filed an amended counterclaim and a motion for summary judgment.

9. In a Memorandum Decision dated January 24, 1994, the Court granted the Government's motion for summary judgment against Treglia and denied its motion against Katz, Rizzuto and Weiss. On February 14, 1995 Rizzuto and Katz entered into a stipulation of settlement and dismissal with the Government. Weiss proceeded to trial.

10. Promovision Video Displays Corp. ("Promovision") was formed in August 1983 by Weiss, Treglia and Gerald P. Broder ("Broder"). From the time of its inception, Weiss was Promovision's President and Chairman of its Board of Directors. Treglia was its Executive Vice President and a member of the Board of Directors.[1]

11. Promovision was in the advertising business, placing monitors with scrolling advertisements for local advertisers and coupons dispersing machines in stores.

12. Weiss, Treglia, Katz, Rizzuto and others had discussions that led to the formation of Promo–Net as a wholly owned subsidiary of Promovision.

13. Before Promo–Net was formed, Rizzuto and Katz were principals and shareholders of Metrotech. Alvin Grubman ("Grubman") was its accountant. Because Metrotech's capabilities appeared to complement Promovision's needs, Weiss and Treglia sought to acquire Metrotech. After attempts to acquire Metrotech failed, Promo–Net was formed by Weiss and Treglia as a wholly-owned subsidiary of Promovision in December 1985. At that time Weiss appointed Katz to be President of Promo–Net and Grubman to be Vice President. He stated specifically that he did not want Rizzuto to be an officer at that time.

14. Katz, as President, Rizzuto, as Vice President, and Weiss, as Secretary, signed the bank certificate and signature cards for Promo–Net's bank account at Manufacturers Hanover Trust Co. in Whitestone, New York. The bank certificate includes a certification that: "the persons herein designated as officers of this corporation [Promo–Net] have been duly elected to and now hold the offices in this corporation set opposite their respective names, and that the following are the authentic, official signatures of said officers."

15. Promo–Net's operations were designed to provide technical support, including graphics and electronic work for Promovision. During the Tax Period, Weiss and Treglia comprised the executive, finance and auditing committee of the Promovision Board of Directors.

16. Weiss was instrumental in establishing Promo–Net. Weiss both hired Rizzuto and Katz and instructed them not to hire Metrotech employees. He also hired Grubman who served as its comptroller until he was fired by Weiss in February 1986. Promo–Net had 6 or 7 other employees.

---

1. Weiss' son, Leonard O. Weiss was also a member of the Board.

17. In August 1986, Weiss and Treglia purchased all of Promo–Net's stock.

18. Weiss, through his control of Promovision, exercised, indirectly, significant control over Promo–Net. Promo–Net had no sources of income or credit independent of Promovision. Promo–Net never had its own billing system in place. When Promo–Net needed cash for operations, Rizzuto would prepare a list of payables and forward it to Promovision for review and approval by Treglia. Rizzuto and Katz understood that Weiss and Treglia's approval was needed for all expenditures. Although Rizzuto and Katz theoretically had check signing authority, in practice, pre-approval by Promovision of all checks, except net payroll checks was required. Rizzuto, for example, was not permitted to write himself checks for reimbursement for petty cash because Weiss instructed him to get pre-approval for such checks from Promovision.

19. Weiss directed Promo–Net to move into the former offices of Promovision in Jamaica, Queens. The lease was held in Promovision's name and Promovision paid the rent and utilities.

20. The managerial groups at Promo–Net and Promovision were small and informally run. The testimony of Katz and Rizzuto, which I credit, was that the officers and employees of Promo–Net understood that Weiss was in charge and that overall authority for the direction, operation and financial control of the company rested with Weiss and Treglia. Rizzuto and Katz further testified that Promo–Net's officers and employees further understood that to incur Weiss' displeasure was to risk discharge.

21. Weiss had access to Promo–Net's books and records which were maintained at Promovision's headquarters on Seaview Boulevard in Port Washington, New York where it performed accounting functions for Promo–Net. Bookkeeping and accounting functions for Promovision and its subsidiaries were done there under the supervision of Treglia. Abdin Aly worked under Treglia at Promovision. Among Aly's responsibilities was the preparation of tax returns for Promovision's subsidiaries including Promo–Net. These returns were signed by Aly and Treglia. Weiss rarely involved himself in decisions about which specific bills to pay, had no involvement in the daily operations of Promo–Net, and rarely if ever, visited its premises.

22. Katz, Weiss and Treglia were authorized to sign checks on Promo–Net's account beginning about December 19, 1985. Katz was authorized to sign checks up to $999; he could also sign checks with a co-signature for checks in excess of that amount. Weiss had, but never exercised, check co-signing authority at Promo–Net. Beginning on or about May 12, 1986, Rizzuto, like Katz, was authorized singly to sign checks up to $999 but needed a co-signature for checks in excess of that amount.

23. Katz and Rizzuto ran Promo–Net's operations on a daily basis and oversaw Promo–Net's employees. Rizzuto handled marketing and product development. Katz provided technical direction for the company, participated in discussions on technical matters and signed business letters on Promo–Net's behalf.

24. Katz was responsible for providing information as to the number of hours each employee had worked each week to Paychex, Inc., which prepared Promo–Net's employee paychecks. All of the checks were for amounts less than $999, and the funds were drawn from Promo–Nets bank account. Katz generally signed the paychecks. Katz also advised Promovision of the net payroll from a printout supplied by Paychex, Inc. Pay stubs accompanying the checks stated the amounts withheld for FICA and withholding taxes.

25. Grubman, Promo–Net's comptroller, wrote to Weiss on February 6, 1986 voicing serious concern over a number of unfulfilled promises apparently made by Weiss to induce Grubman to join Promo–Net. In addition, Grubman expressed his concern that Promo–Net was indebted to the IRS and New York State for approximately $18,000 in payroll taxes:

> Of no small consequence, *I am also very concerned that as of this writing, Promo–Net is indebted to the IRS and New York State for approximately $18,000 in payroll*

*taxes.* I cannot take this lightly because Richard Katz and myself are both officers of Promo–Net and face personal liability. (emphasis in original)

Katz and Rizzuto received copies of this letter on or about that date.

26. On February 10, 1986 Grubman sent a letter to Treglia with copies to Katz, Weiss and Rizzuto, advising that urgent bills, including payroll taxes, needed to be paid. He wrote:

"As you know, payroll taxes for the fourth quarter, 1985 due January 31, 1986 have as yet not been paid and in addition payroll taxes for the month of January 1986 are now delinquent."

27. By letter dated February 11, 1986, Weiss, as President of Promovision, responded to Grubman's letter with copies to Katz and Rizzuto. After chastising Promo–Net's comptroller for the slow pace of its business development and planning, and for higher than expected expenses, Weiss reminded Grubman:

"You may have forgotten that we here [at Promovision] are paying out these funds and all other expenses including salaries."

Also in that letter, Weiss summarily fired Grubman, making his resignation "effective immediately." Finally, and of considerable significance, Weiss responded to Grubman's concerns about unpaid payroll taxes by assuring him that

"Our Company (Promovision) will pay and assume any tax responsibility for which you believe you are liable."

28. Thus, Weiss as of early February, 1986 clearly understood that Promo–Net was experiencing significant cash flow problems, including, unpaid tax trust fund liabilities. Weiss discussed this tax problem with the key managers at Promo–Net and Promovision. The testimony of Katz and Rizzuto, which I credit, is that Weiss had the authority to correct this problem and to take the necessary steps to ensure that trust fund payments were made.

29. Indeed, Weiss personally assured Grubman and the other members of the management group that he would see to it that Promovision assumed and paid Promo–Net's tax liability. Having been advised of the existence of unpaid taxes, Weiss, after February 1986, made no inquiries to determine whether Promo–Net's taxes were paid timely or properly, or to correct any operational deficiencies at Promo–Net that led to the non-payment of withholding taxes.

30. There was due and owing to the IRS for the first, second and third quarters of 1986 (the "Tax Period") the sum of $36,993.08 for FICA and withholding taxes. Penalties and interest on that amount are also due. The IRS has not received payment of these amounts.

31. Throughout the Tax Period, Promovision continued to approve the payment of bills to creditors, other than the Government, although Promo–Net's bank statements indicated significant funds existed to pay the Government. Instead, throughout the Tax period, Promo–Net continued to pay other of its vendors and to pay net payroll to its employees.

### CONCLUSIONS OF LAW

1. Sections 3102 and 3402 of the Internal Revenue Code require employers to withhold federal social security and income taxes from their employee's wages. 26 U.S.C. §§ 3102, 3104. The taxes withheld from each employee's wages constitute a special fund held in trust for the benefit of the United States under 26 U.S.C. § 7501. *Slodov v. United States,* 436 U.S. 238, 242–43, 98 S.Ct. 1778, 1782–83, 56 L.Ed.2d 251 (1978); *Fiataruolo v. United States,* 8 F.3d 930, 938 (2d Cir. 1993).

2. Because the IRS has no recourse against employees who have had income and social security taxes withheld from their wages, 26 U.S.C. § 6672(a) authorizes the IRS to collect taxes from individuals who were responsible for the corporation's failure to pay them. *Monday v. United States,* 421 F.2d 1210, 1214 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970); *Gephart v. United States,* 818 F.2d 469 (6th Cir.1987); see *United States v. Rem,* 38 F.3d 634 (2d Cir.1994). Section 6672(a) provides:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax ... [shall] be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

■ 3. An individual may be personally liable for unpaid taxes if he meets two requirements. He must be a "responsible person" under the statute, and he must "willfully" fail to pay over to the government the amount due. See *Hochstein v. United States,* 900 F.2d 543, 546 (2d Cir.1990), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2967, 119 L.Ed.2d 587 (1992); see also *Thomsen v. United States,* 887 F.2d 12, 14 (1st Cir.1989).

■ 4. The burden of proof in recovery cases is on the taxpayer; the IRS is presumed to be correct. See *Rem,* 38 F.3d at 643; *Hochstein,* 900 F.2d at 546.

5. A responsible person is "[a]ny person required to collect, truthfully account for, and pay over" the relevant tax. 26 U.S.C. § 6672(a); see *Hochstein,* 900 F.2d at 546; *Kalb v. United States,* 505 F.2d 506, 510–11 (2d Cir.1974), *cert. denied,* 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975). Courts have taken a "broad view" of who qualifies as a "responsible person" within the meaning of Section 6672. *Rem,* 38 F.3d at 642; see *Fiataruolo,* 8 F.3d at 938.

■ 6. In determining whether an individual is a responsible person, the Court looks generally to his degree of influence or control over the corporation's finances. See *Hochstein,* 900 F.2d at 547. Individuals who have a significant degree of control are considered responsible. This definition "is meant to encompass 'all those connected closely enough with the business to prevent the [tax] default from occurring.'" *Fiataruolo,* 8 F.3d at 939 (citation omitted). While no single factor is dispositive in determining whether an individual had significant control, the following considerations are relevant: (1) status as an officer or director; (2) ownership of shares or possession of an entrepreneurial stake in the company; (3) role in the day-to-day management of the company; (4) ability to hire and fire employees; (5) ability to make decisions regarding which, when and in what order outstanding debts or taxes will be paid; (6) control over daily bank accounts and disbursements records; and (7) authority to sign corporate checks. *Rem,* 38 F.3d at 643; *Fiataruolo,* 8 F.3d at 939; *Hochstein,* 900 F.2d at 547; *Gephart,* 818 F.2d at 473; *Carter v. United States,* 717 F.Supp. 188, 192 (S.D.N.Y.1989).

■ 7. The ability to write checks or control funds is significant because it demonstrates the power to pay the withheld taxes to the Government instead of paying other creditors. See *Carter,* 717 F.Supp. at 192; *Gold v. United States,* 506 F.Supp. 473, 478 (E.D.N.Y.), *aff'd,* 671 F.2d 492 (2d Cir.1981).

■ 8. A responsible person cannot absolve himself of liability merely by delegating this duty to another person. *Fiataruolo,* 8 F.3d at 939; *Hornsby v. IRS,* 588 F.2d 952, 953 (5th Cir.1979).

■ 9. More than one person may be responsible for trust fund taxes. See *Rem,* 38 F.3d at 642; *Fiataruolo,* 8 F.3d at 939. Thus, the existence of the same duty in another person does not absolve a responsible person of liability for nonpayment of the federal employment taxes. *Gephart,* 818 F.2d at 473. One may be liable under Section 6672 even if he or she is not the *most* "responsible" person, *Hochstein,* 900 F.2d at 547; *Gephart,* 818 F.2d at 476, and does not have day-to-day control over corporate affairs. See *Purcell v. United States,* 1 F.3d 932, 937 (9th Cir.1993). "The critical consideration is whether there exists a sufficient nexus between the plaintiff and the delinquent corporation's financial operation to warrant a finding that the plaintiff participated in decisions concerning the payment of creditors and the disbursal of funds and thus had authority to determine whether the United States or other creditors would be paid." *Gold,* 506 F.Supp. at 478.

■ 10. Weiss was a responsible officer of Promo–Net during the Tax Period. As stated above, Weiss was an officer, a director, a founder and later a shareholder of

Promo–Net. Although he may not have been involved in the company's daily affairs, Weiss nevertheless exercised significant control over Promo–Net's finances. *Caterino v. United States,* 794 F.2d 1, 5–6 (1st Cir.1986), *cert. denied,* 480 U.S. 905, 107 S.Ct. 1347, 94 L.Ed.2d 518 (1987); see *Purcell,* 1 F.3d at 937 (even if "an individual's day-to-day function in a given enterprise is unconnected to financial decisionmaking or tax matters" he is still responsible as long as he has "the authority to pay or to order the payment of delinquent taxes"). As Secretary, Weiss had authority to co-sign checks on Promo–Net's account, and so he could decide which creditors should be paid and whether to pay trust fund taxes to the Government. See *Bowlen v. United States,* 956 F.2d 723, 728 (7th Cir.1992). As discussed above, it is Weiss' ability to decide, not whether, in fact, he actually co-signed checks, that is relevant for purposes of determining his responsibility. See *Purcell,* 1 F.3d at 937.

11. As Promovision's President, Weiss also was in a position to control Promo–Net's finances because Promovision provided the only source of funds to Promo–Net, its wholly-owned subsidiary. Indeed, as Weiss himself admitted at trial, if he had known about the tax liability, he would have paid the taxes. Further, as early as February 1986, Weiss committed to Grubman to pay Promo–Net's trust fund taxes after Grubman requested additional funding for payment of Promo–Net's expenses, including trust fund taxes.

12. Weiss also asserted his control when he demanded and obtained Grubman's resignation.

■ 13. "A person willfully fails to pay withholding taxes within the meaning of section 6672 when he pays other creditors with knowledge that withholding taxes are due." *Hochstein,* 900 F.2d at 548; *Kalb,* 505 F.2d at 511; *Carter,* 717 F.Supp. at 193–94. In other words, willfulness is established by a "responsible person's use of funds or his knowledge of the use of funds for payments to other creditors after he is aware of the failure to pay the withholding tax." *Bowlen,* 956 F.2d at 729; *Ruth v. United States,* 823 F.2d 1091, 1094–95 (7th Cir.1987).

■ 14. Bad purpose or evil motive in failing to collect and pay taxes "'properly play no part in the civil definition of willfulness.'" *Hochstein,* 900 F.2d at 548 (citation omitted). Indeed, neither a responsible person's discomfort over failing to pay withholding taxes, nor his desire to see them paid, make the person's failure to pay any less willful. *Hochstein,* 900 F.2d at 548.

■ 15. Further, willful conduct can be demonstrated by a reckless disregard for whether taxes are being paid. See *Thomsen,* 887 F.2d at 17, 18; *Kalb,* 505 F.2d at 511; *Carter,* 717 F.Supp. at 193. For this purpose, recklessness is the equivalent of gross negligence and is established if the party "(a) knew of the company's obligation to pay withholding taxes, and (b) knew that company funds were being used for other purposes instead." *Rem,* 38 F.3d at 643; *Hochstein,* 900 F.2d at 548. Unless a party has a reasonable belief that taxes were being paid, willfulness includes "failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the Government." *Kalb,* 505 F.2d at 511.

■ 16. Under these standards, Weiss' failure to pay over withholding taxes was willful. As the CEO of Promo–Vision, Weiss knew of trust fund tax obligations in general. Further, as indicated by the testimony of Rizzuto and Katz, Weiss knew that, instead, Promo–Net's funds were being used to finance its equipment.

17. Weiss became aware of Promo–Net's nonpayment of its trust fund taxes in February 1986 when Grubman indicated in the letter that Promo–Net's tax obligations were a source of concern for him. In a letter responding to Grubman, Weiss assured him that: "Our Company will pay and assume any tax liability for which you believe you are liable." Despite this representation, Weiss admits that he did not inquire or take any steps to determine whether the taxes were paid. Nor would it have been difficult for Weiss to have made this determination since he had access to the company's books and records. In addition, as Promovision's Presi-

dent, Weiss was aware that Promo–Net derived all of its funding from Promovision and could have determined whether Promo–Net's trust fund taxes were being paid. See *Regan & Co. v. United States,* 290 F.Supp. 470, 481–82 (E.D.N.Y.1968); see also *Caterino,* 794 F.2d at 6. His failure to inquire about the status of the trust fund taxes after "being put on notice that withholding tax problems exist, constitutes willful conduct." *Gold,* 506 F.Supp. at 473; *Carter,* 717 F.Supp. at 194.

### CONCLUSION

For, the foregoing, reasons, this court finds in favor of the United States of America.. Judgment shall be entered for the United States of America.

**SO ORDERED.**