**Manfred REIFF Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 05 CIV. 6855 CM.**

United States District Court, S.D. New York.

Oct. 26, 2006.

---

Hugh Janow, Law Offices of Hugh Janow LLC, Pearl River, NY, for Plaintiff.

Melanie Robin Hallums, U.S. Attorney's Office, New York, NY, for Defendant.

## DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

In May 2003, the Internal Revenue Service assessed a trust fund recovery penalty against Manfred Reiff ("Reiff") as a responsible person pursuant to 26 U.S.C. § 6672 for the unpaid withholding tax obligations of LuuLuu.com, Inc. ("LuuLuu"). Over the last two quarters of 2000 and the first quarter of 2001, LuuLuu failed to pay approximately $193, 571.00 in federal employee withholding taxes. In August 2005, plaintiff brought this action challenging the assessment against him and seeking a refund of the $10, 649 collected in partial satisfaction of the obligation, and the Government filed a counterclaim seeking to reduce to judgment the balance of the unpaid assessment. The plaintiff does not contest the amount of the IRS's assessment, but he does contest his liability as a responsible person. Although he concedes he was a responsible person for the first two quarters of 2000, he contends that he was ousted from this position upon the arrival of Gloria Gavin ("Gavin") as acting CEO of LuuLuu in July 2000 and should therefore not be liable for LuuLuu's unpaid withholding obligations.

### Facts

*Undisputed Facts*

The following facts are undisputed for purposes of this summary judgment motion:

In November 1999, Reiff and Jody Raida ("Raida") founded LuuLuu, an internet start-up company formed to design web-based computer software. (Deposition of Manfred Reiff, dated January 5, 2006 ("Reiff Dep") at 49.) Reiff had developed the idea that led to LuuLuu's formation, which was to create a "fit and sizing" application for use by manufacturers who sold clothing to customers over the internet. (Id at 46–48.)

At all relevant times, Reiff was a member of LuuLuu's Board of Directors. In fact, from November 1999 until February 2001, Reiff and Raida were the company's only directors. (*Id.* at 93–94.) On November 23, 1999, Reiff was elected Vice–President of LuuLuu. (Written Consent of the Initial Board of Directors of LuuLuu.com, Inc. at 2.) Reiff also owned a "substantial amount" of shares in LuuLuu, approximately 40 percent. (*Id.* at 149.) Another company that Reiff had co-founded in 1996 or 1997, The Firm Creative, invested start-up money in LuuLuu. (*Id.* at 64.) From November 1999 until February 2000, Reiff and Raida operated LuuLuu out of the same office as The Firm Creative in Manhattan and were LuuLuu's only employees. (*Id.* at 67, 71.)

In February 2000, LuuLuu moved its business to San Francisco and Reiff followed, while Raida remained in New York where LuuLuu continued to maintain an office. (*Id.* at 25, 68, 77–78.) Reiff worked in the day-to-day operations of LuuLuu's San Francisco office as the Technical Director, in which capacity he oversaw the team of technical employees. (*Id.* at 72, 78.) Likewise in February 2000, LuuLuu hired David Laird ("Laird") as its office manager. (*Id.* at 81: Deposition of David Laird, dated April 19, 2006 ("Laird Dep.") at 14.) Laird was responsible for setting up accounts with vendors, ordering office supplies, paying bills, setting up pay-roll, and some human resources functions. (*Id.* at 15.) When Laird first started at LuuLuu, Reiff and Raida directed him regarding what bills to pay, where to send offers of employment, and "what to do to make the office function." (*Id.* at 21.)

In late May or June of 2000, Reiff learned from Raida that LuuLuu was out of money. (Reiff Dep at 150–51). Reiff and Raida then convened a teleconference with LuuLuu's "key investors," Gloria Gavin ("Gavin") and Simon Khalaf, to inform them of LuuLuu's financial problems and subsequently met with Gavin, Gavin's husband and possibly two other investors in San Francisco. (*Id.* at 151–52). At the meeting, they discussed "how to move forward," and decided that "the only person who could move things forward was Gloria Gavin due to being the contact person for all the investors for the funding." (*Id.* at 153.) Gavin became the acting CEO of LuuLuu effective July 15, 2000. (Acting CEO Agreement for Gloria Gavin.)

In July 2000, LuuLuu stopped using its prior payroll service, ADP. (Laird Dep. at 30). Laird was instructed by Gavin and Raida to stop using ADP because LuuLuu did not have enough money to pay the withholding taxes. (*Id.* at 30, 32). Laird sent an e-mail message to several employees, including Reiff, informing them that LuuLuu would no longer be using ADP "[i]n an effort to cut back on some extraneous costs." (E-mail message from David Laird, dated July 27, 2000.) Laird later testified that this was a lie, and the real reason why LuuLuu stopped using ADP was that Gavin "didn't want to pay the taxes." (Laird Dep at 106.) As of July or August 2000, Reiff knew that his paychecks were being issued "in-house" rather than by ADP. (Reiff Dep. at 124.)

In the fall of 2000, Reiff allowed LuuLuu to use his credit card to pay for various expenses, and LuuLuu did not reimburse

him for the majority of the charges. (Reiff Dep. at 158–60.) On several occasions during the same period, Reiff was not paid his salary. (*Id.* at 147, 209; Laird Dep at 42, 44, 54.) Reiff was also aware that during the same period, LuuLuu was not paying Raida her salary and was failing to pay some of its creditors in a timely manner. (Reiff Dep. at 148, 210–11; Laird Dep. at 41, 61–62.)

In October 2000 George Noceti ("Noceti") took over as CEO because Gavin "felt somebody was needed to attract further funding." (Reiff Dep. at 114.) His efforts were apparently to no avail because by March 2001, LuuLuu had once again run out of funds. (*Id.* at 98.) In February or March 2001, Gavin and Noceti wanted to dismiss the employees of the company without pay for the last two weeks, but Reiff found this "ethically and morally completely wrong." Id at 128. He spoke to either Laird or Noceti to find out how much money was required to cover payroll and wrote LuuLuu a check for $15,000. (*Id.* at 128–29.) Reiff further informed LuuLuu's technical employees that they were being dismissed. He "met with every single employee and explained to them that the company is out of funds and it can't continue." (*Id.*) Reiff was the person in charge of the technical shut-down of LuuLuu. (*Id.* at 131.) He asked the technical employees to deposit their work in a central computer server so that it could be accessible "in case there would be any future relevance." (*Id.*)

In March 2001, Reiff also "confronted" Noceti about the status of LuuLuu and the latter informed him of the company's outstanding employment tax obligations. (*Id.* at 154.) Reiff testified that he "had to basically force that meeting." (*Id.*) After meeting with Noceti in March 2001, Reiff did not discuss LuuLuu's reporting tax obligations with either Gavin or Noceti.

(*Id.* at 178–78.) He testified that he "had a very difficult time with [Gavin] and did not confront her." As for Noceti, Reiff testified, "He had shown himself as not very useful to the company, and to be honest, I just felt I was on my own with a problem that was just mine because nobody had done anything and it was just the huge magnitude of a problem." (*Id.*) Shortly after, Reiff and Raida fired Gavin and Noceti at a board of directors' meeting. (*Id.* at 200.)

After the technical employees had been laid off, Reiff started "winding down the whole business" and "worked on opportunities to sell the company or sell the company's assets and looked at numerous possibilities." (*Id.* at 132, 162.) Reiff was by now the only one left in the San Francisco office. (*Id.* at 175–76.) Reiff testified, "When I finally started the cleanup, I to my great dismay discovered all documentation in complete disarray, no filings done anywhere, and I had not much knowledge of business and I just learned and said, I need to do something here to make sense of this mess." (*Id.* at 175–76.) He sought legal counsel and hired an accountant "because there were no official books at LuuLuu and any reasonable accounting." (*Id.*)

Kenneth Wang, an investor and a creditor of LuuLuu, acquired all of the company's assets, which included office furniture, computer equipment, the program code, and "all the work that had been done on the product." (*Id.* at 163.) In April 2001, Reiff approached potential investors about investing money in LuuLuu, but none did. (*Id.* at 164–65.) Between July and September 2001, Reiff was hired as CEO of Wang's company, Alvanon. In the fall of 2002 Reiff's title at Alvanon changed from CEO to technical director, and in the summer of 2003, he was fired from Alvanon. (*Id.* at 224–25, 228.)

LuuLuu failed to pay approximately $193, 571.00 in federal employee withholding taxes—$56,666 in the third quarter of 2000; $77, 837.50 in the fourth quarter of 2000; and $59, 067.50 in the first quarter of 2001. (Certificates of Assessment for the periods ending September 30, 2000, December 31, 2000, and March 31, 2001) On or about May 23, 2003, the IRS assessed a 100 percent penalty against Reiff. (*Id.*) The IRS identified him as a responsible person for purposes of Internal Revenue Code § 6672 liability. (Id.) Reiff concedes that he was a responsible person for the first two quarters of 2000. (Cplt. at 6.)

*Disputed Facts*

Unsurprisingly, the parties' disagreements center around the level of control Reiff exerted over LuuLuu's business affairs and his purported knowledge of LuuLuu's failure to pay employment withholding taxes during the periods for which unpaid taxes were assessed.

## 1. Control over LuuLuu's business affairs

With respect to the first of these issues, the Government contends that in addition to his undisputed status as a member of LuuLuu's board of directors and his significant ownership stake in the company, the following represent indicia of Reiff's responsibility for LuuLuu's business and fiscal affairs: 1) Reiff had the power to hire and fire LuuLuu's employees (Reiff Dep at 78–81; 200); 2) Reiff was an officer of the corporation throughout the relevant time period (*Id.* at 71, 92); 3) as an officer, Reiff was authorized to sign contracts and other documents in the name of LuuLuu as well as to issue certificates for shares of its stock (Written Consent of the Initial Board of Directors at 2); 4) Reiff was authorized to sign checks on behalf of LuuLuu and did, in fact, sign several checks on its behalf (Laird Dep. at 27; Reiff Dep.

at 137; Declaration of Elizabeth A. Stanford and checks dated April 18, 2000, February 9, 2001, March 16, 2001, March 20, 2001, and March 22, 2001); 5) Gavin was an independent contractor rather than an employee of the company and, pursuant to her contract, was required "to report to, and be directed by the Chairman of the Board and/or the President" of LuuLuu (Acting CEO Agreement for Gloria Gavin at 2).

Reiff counters that whatever authority over LuuLuu's business affairs he may have possessed at its inception, he was effectively stripped of that authority when Gavin came in as acting CEO in June 2000. Thus, he alleges, he no longer exercised significant control over LuuLuu's business and financial matters during the time periods for which unpaid taxes were assessed. Specifically, Reiff contends that while he had the authority to hire and fire employees during LuuLuu's start-up phase, once Gavin became CEO "she completely ran the business" and "every single decision had to go through her." (Reiff Dep. at 105, 110.) In contrast, Laird testified that Reiff participated in hiring Noceti as CEO but was relegated solely to his technical management functions and deprived of any operational business control after that point.(Laird Dep. at 36.) Furthermore, Reiff has testified that he was only an officer of LuuLuu until June 2000 and was stripped by Gavin's arrival of such operational authority as would enable him to sign contracts and other documents on the company's behalf or issue certificates for shares of company stock. (Reiff Dep. at 92, 105, 107–109.) Laird likewise testified that even if Reiff was able to negotiate contracts or loans, he would not have been able to sign off on them without Gavin's or Noceti's permission after July 2000. (Laird Dep. at 83.) While the Government contends that Reiff supported the decision

to use Gavin's funds and connections to help move LuuLuu forward, Reiff counters that he had no choice but to accept Gavin's help at the price of a severely diminished role in the company. (Reiff Dep. at 105–106; Laird Dep. at 36.)

Reiff hotly disputes the significance of the five checks purportedly bearing his signature. At his deposition, Reiff testified that he did not know whether he had the authority to sign checks on behalf of LuuLuu, and that he may have signed one or two checks on the company's behalf but he did not know for sure. (Reiff Dep at 136–37.) Since Reiff has conceded that he was responsible for the payment of LuuLuu's withholding taxes prior to Gavin's arrival in June 2000 (and that time period is not at issue here), he argues that the April 18, 2000 check is simply irrelevant. As to the remaining four checks, plaintiff argues that they fail to demonstrate that he had signature authority during the periods for which unpaid withholding taxes were assessed. Plaintiff urges that the very fact that, among the seven hundred checks produced, defendant was able to find only one between June 2000 (when Gavin became CEO) and March 2001 (when Reiff admittedly asserted control over the company's-by then dire-affairs) supports his claim that he did not have any financial control of LuuLuu during the relevant time periods.

Finally, Reiff alleges that based on the entire record, Gavin functioned as an employee of LuuLuu rather than an independent contractor. He testified that he never understood her position to be one of an independent contractor and that he believed she was responsible for the company's fiscal matters. (Reiff Dep. at 188.) Although Gavin's contract required her to report to and abide by the decisions of the board, Reiff contends she did not. Rather, he testified, it was Gavin who called all the

shots at LuuLuu, and every decision made during the relevant periods had to go through her. (*Id.* at 105, 112.) Similarly, Laird testified that Gavin was "in charge of making decisions on who got paid, period, from consultants to vendors to whatever." (Laird Dep. at 61.) Laird testified that Gavin "had the money and called the shots" and, significantly, that he believed that even if Reiff had known that withholding taxes were not being paid, he would have had no ability to direct the corporation to pay them. (*Id.* at 91.) In fact, Laird testified that he was directed by Gavin not to talk to Reiff about the company's failure to pay withholding taxes. (Id.)

### 2. Knowledge of LuuLuu's failure to pay withholding taxes

The Government contends that Reiff knew of LuuLuu's failure to pay withholding taxes during the periods for which unpaid taxes were assessed because 1) he knew that LuuLuu stopped using the payroll service, ADP (Reiff Dep at 123–24); 2) was informed by Laird of LuuLuu's failure to pay the withholding taxes on at least two occasions (Laird Dep at 32, 35, 90–91); and 3) knew that LuuLuu was failing to meet other major financial obligations.

Reiff responds that he accepted Laird's explanation that LuuLuu ceased to use ADP as a cost-cutting measure because he "trusted the business department," which consisted in his view of Gavin and Laird, and had insufficient knowledge of the process to question them. (Reiff Dep at 124.) He testified that he finally became aware that LuuLuu was not current on its taxes only when he confronted Noceti about the status of the company in March 2001. Laird, in turn, testified that he did not specifically recall when he may have had a conversation with Reiff about LuuLuu's failure to pay withholding taxes and that it was possible his recollection of the conver-

sation was mistaken. (Laird Dep at 90.) When told that Reiff did not recall such a conversation taking place, Laird confirmed that he believed Reiff to be an "honest, truthful individual." (Laird Dep at 94.) Reiff admits that he knew LuuLuu was failing to meet other financial obligations, but once again contends he placed his trust in Gavin, Noceti, and Laird until the extent of their fiscal mismanagement and their failure to pay the withholding taxes finally came to light in March 2001.

## Discussion

### I. *Standard of Review*

Under Federal Rule of Civil Procedure 56(c), a court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Granting of summary judgment is appropriate "where the nonmovant's evidence is merely colorable, conclusory, speculative, or not significantly probative." *Travelers Ins. Co. v. Broadway W. Street Assoc's.,* 164 F.R.D. 154, 160 (S.D.N.Y.1995) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). Before a district court grants summary judgment, "the record must clearly establish both 'the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment.'" *Pangburn v. Culbertson,* 200 F.3d 65, 69 (2d Cir.1999) (citing *Ramsey v. Coughlin,* 94 F.3d 71, 74 (2d Cir. 1996)). Summary judgment is improper if there is any evidence in the record that would allow a reasonable fact-finder to find in favor of the non-moving party. On a motion for summary judgment, the court views the record in the light most favorable to the non-moving party and resolves all ambiguities and draws all reasonable inferences against the moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs,* 834 F.2d 54, 57 (2d Cir. 1987).

### II. *Statutory Background*

■ Under the Internal Revenue Code, employers are required to withhold federal income and social security taxes from their employees' wages. Employers must keep the withheld funds "in trust for the United States," 26 U.S.C. 7501(a) and pay them to the IRS on a quarterly basis. *Fiataruolo v. United States,* 8 F.3d 930, 938 (2d Cir. 1993).

■ An employer who fails to pay the withheld funds is liable for their payment. In addition an individual who is responsible for the tax delinquency may be held personally liable. 26 U.S.C. 6672(a) provides:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat such tax or the payment thereof, shall ... be liable to a penalty equal to the total amount of the tax evaded or not collected, or not account for and paid over.

"Under this section, a party may be held liable for unpaid taxes if: first, he is the 'responsible' person for collection and payment of the employer's taxes, and second, he 'wilfully' failed to comply with the statute." *Fiataruolo,* 8 F.3d at 938 (quoting *Godfrey v. United States,* 748 F.2d 1568, 1574 (Fed.Cir.1984)); *see also Slodov v. United States,* 436 U.S. 238, 246 n. 7, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978). An

individual against whom IRS has made a § 6672(a) assessment has the burden of proof with respect to the elements of liability under that section. *See, e.g., Lesser v. United States,* 368 F.2d 306, 310 (2d Cir. 1966) (en banc on this issue). Thus, he must prove by a preponderance of the evidence either that he was not a "responsible person" or that his failure to pay the taxes was not willful. *See, e.g., Fiataruolo,* 8 F.3d at 938. Summary judgment is appropriate in a § 6672(a) dispute "where there are no genuine questions as to the assessed individual's control of company funds and decisionmaking authority, his or her knowledge of the deflection of company funds to payees other than the IRS, or the existence or reasonableness of his or her belief that the taxes were, in fact, being paid." *Winter v. United States,* 196 F.3d 339, 346 (2d Cir.1999).

III. *Responsible Person*

 Because § 6672(a) is "a vital collection tool" intended to ensure the smooth flow of necessary revenues to the government, "courts generally take a broad view of who qualifies as a responsible person," *Fiataruolo,* 8 F.3d at 938. More than one individual may be a responsible person within the meaning of § 6672(a). *See, e.g., Fiataruolo,* 8 F.3d at 939; *Kinnie v. United States,* 994 F.2d 279, 284 (6th Cir.1993); *Gephart v. United States,* 818 F.2d 469, 476 (6th Cir.1987) ("[w]hile it may be that [other corporate officials] were *more* responsible than plaintiff, and exercised *greater* authority, this does not affect a finding of liability against the plaintiff" (emphasis in original)). It is likewise not necessary for the individual in question to " 'have the final word as to which creditors should be paid in order to be subject to liability under this section.' " *Hochstein v. United States,* 900 F.2d 543, 547 (2d Cir.1990)(quoting *Gephart,* 818 F.2d at 475). Moreover, a person in a position of

control and responsibility in a company cannot avoid liability by delegating authority to others. *Fiataruolo,* 8 F.3d at 939.

 The determinative question " 'is whether the individual has *significant control* over the enterprise's finances.' " *Id.* 8 F.3d at 939 (quoting *Hochstein,* 900 F.2d at 547 (emphasis in *Fiataruolo* )). No single factor is dispositive in evaluating whether the individual had significant control; that determination must be made in light of "the totality of the circumstances," *Fiataruolo,* 8 F.3d at 939. To determine whether an individual is, indeed, a responsible person, courts consider whether the person

(1) is an officer or member of the board of directors, (2) owns shares or possesses an entrepreneurial stake in the company, (3) is active in the management of day-to-day affairs of the company, (4) has the ability to hire and fire employees, (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, (6) exercises control over daily bank accounts and disbursement records, and (7) has check-signing authority.

*Id.; see also Hochstein,* 900 F.2d at 547; *Barnett v. IRS,* 988 F.2d 1449, 1455 (5th Cir.1993); *Bowlen v. United States,* 956 F.2d 723, 728 (7th Cir.1992). Thus, while § 6672(a) "is not meant to ensnare those who have merely technical authority or titular designation," the section encompasses " 'all those connected closely enough with the business to prevent the [tax] default from occurring,' " *Fiataruolo,* 8 F.3d at 939. (quoting *Bowlen,* 956 F.2d at 728).

 Viewed in the light most favorable to the plaintiff, the evidence presents genuine issues of material fact as to whether he was a responsible person within the meaning of § 6672(a) during the relevant

time periods. The Second Circuit has made clear that an individual will not be adjudged a "responsible person" under § 6672(a) if he can establish that despite possessing the hallmarks of "significant control" over the company's finances, he lacked such control as a matter of fact. *United States v. Landau,* 155 F.3d 93, 101 (2d Cir.1998). In the present case, the Government has adduced considerable evidence tending to establish such hallmarks of plaintiff's authority over LuuLuu's business and fiscal affairs. Yet plaintiff contends, with support from evidence in the record, that even if he possessed some indicia of control over LuuLuu, as a practical matter he had none. Resolution of this dispute requires the kinds of credibility determinations and assessments of conflicting evidence that are properly the province of the jury.

All but two of the *Fiataruolo* factors-Reiff's position as a member of the board of directors and significant ownership stake in the company-are disputed. Even the time period during which plaintiff remained an officer of the company, and enjoyed the prerogatives of that position, is contested. A reasonable jury could believe Reiff's testimony, buttressed in relevant respects by Laird, that when she took over as CEO in June or July of 2000, Gavin assumed total control of LuuLuu and stripped Reiff of any operational authority over the day-to-day management of the company or its fiscal affairs.

With respect to Reiff's ability to hire and fire employees, Laird's testimony indicates that he participated in hiring Noceti in October 2000. Moreover, once the company apparently hit rock bottom in March 2001, he personally terminated all of the technical employees and ultimately fired both Noceti and Gavin. The evidence on this point is, of course, contradicted. Laird testified he did not believe that Reiff

was able to hire people after July 2000 without Gavin's approval, and Reiff testified that Gavin hired and fired employees during the relevant time periods. (Laird Dep at 82; Reiff Dep at 198.) Reiff's pivotal role in dismissing the technical employees as well as Noceti and Gavin is consistent with his admitted return to a position of power in the company in March 2001. In the face of this dispute, I cannot conclude that no reasonable jury could find Reiff lacked control over the hiring and firing of employees prior to LuuLuu's meltdown in March 2001.

Similarly, to the extent that Reiff took over the technical shutdown of LuuLuu, the sale of its assets, the removal of equipment, etc., a reasonable jury could find he assumed this role only at the end of March 2001 when he learned of the extent of Gavin's, Noceti's, and Laird's failure to discharge their business responsibilities-including their failure to pay withholding taxes. Likewise, Reiff and Laird both testified that Gavin had sole responsibility for determining which creditors got paid and when. Most significantly, Laird testified to his belief that, under Gavin's tenure, Reiff would have been unable to order the payment of LuuLuu's delinquent withholding taxes if he had tried to do so. If believed, this testimony would show that plaintiff lacked the "power to compel ... the allocation of corporate funds" that would subject him to § 6672(a) liability. *Carter v. United States,* 717 F.Supp. 188, 192 (S.D.N.Y.1989)(quoting *Schwinger v. United States,* 652 F.Supp. 464, 466–67 (E.D.N.Y.1987)).

A material dispute likewise remains as to plaintiff's authority to sign checks for the corporation. While Laird testified that Reiff possessed such authority, Reiff responded that he did not know whether or not he was authorized to sign checks for LuuLuu at the relevant times. Moreover,

the April 18, 2000 check was signed during a period for which Reiff concedes he was a responsible person (and no unpaid taxes were assessed), a time that preceded Gavin's accession as CEO. The remaining four checks have a combined total of $849.00, a relatively modest sum when compared with the company's substantial financial responsibilities. Furthermore, three of those four checks were signed in March 2001 when Reiff, by his own admission, had no choice but to reassert control over the company's business and financial matters. In support of its motion, the Government points to *O'Callaghan v. United States,* 943 F.Supp. 320 (S.D.N.Y.1996), a case in which the court granted summary judgment when the plaintiff executed only three checks on the company's bank accounts. Yet several important features distinguish *O'Callaghan* from the present case. In *O'Callaghan,* evidence was produced that plaintiff was the sole authorized signatory on the company's bank accounts, checks issued by the company were signed using a fascimile rubber stamp of his signature, and he obtained a $500,000 loan on behalf of the company. 943 F.Supp. at 323.

No such additional evidence has been adduced here to show plaintiff's actual or authorized involvement in the company's financial affairs during the relevant period. To the contrary, plaintiff has adduced evidence tending to show that, under Gavin, he was incapable of exerting the kind of control over the company's finances that his position at LuuLuu may otherwise have indicated.[1]

In *Winter,* the Second Circuit reversed a grant of summary judgment in favor of the Government on facts similar to those presented here. The court found that although the Government introduced uncontroverted evidence that the corporate secretary against whom withholding taxes had been assessed was an officer, director, and shareholder of the company, she had adduced evidence showing someone else exercised effective control over her interest in the company. 196 F.3d at 346. And although the Government introduced evidence that she had check-signing authority, the plaintiff countered with evidence that she had virtually no power to sign a check without the knowledge or consent of others. *Id.* Finally, the Government set forth evidence showing that she was involved in important decisions regarding the company's operation, but she introduced contrary evidence tending to show that she had no decisionmaking authority over its affairs, financial or otherwise. *Id.* The *Winter* court concluded that although the secretary's ownership interest, titles, and check-writing authority indicated that she may have been a responsible person, other evidence tended to show that she may have "exercised little actual control over the company's purse strings." *Id.* These disputed material facts rendered the case inappropriate for decision on summary judgment. The same is true of the case at bar.

The Government argues that, to the extent that Reiff did not take part in LuuLuu's business affairs, his exclusion was the self-imposed result of an improper delegation of his responsibility for the company's

---

1. Further underscoring the point, in *Landau,* the Second Circuit approvingly cited Judge Leval's concurrence in *United States v. Rem,* 38 F.3d 634, 647 (2d Cir.1994): "The power to sign checks and the holding of corporate office are indeed factors that courts have listed as helpful in deciding whether an individu-al possessed the necessary power, but they are only factors. Either can exist in circumstances where the individual in reality does not possess significant control over corporate finances. When this is so, the potentially devastating 'responsible person' liability should not be imposed."

financial obligations-including the payment of its employee withholding taxes. If correct, the Government's contention would support § 6672(a) liability since a person in a position of control and responsibility in a company cannot avoid such liability by delegating to others the authority to pay withholding taxes. *Fiataruolo,* 8 F.3d at 939; *see also O'Callaghan,* 943 F.Supp. at 324; *Beeler v. United States,* 894 F.Supp. 761, 773 (S.D.N.Y.1995); *Rizzuto v. United States,* 889 F.Supp. 698, 704 (S.D.N.Y. 1995). There are significant indications in the record that plaintiff may have engaged in such improper delegation. As a co-founder, director, and officer of LuuLuu, he may indeed have acquiesced too easily in the limited role Gavin set out for him or been too credulous when it came to Gavin's and Laird's supposed expertise in fiscal affairs. On this motion for summary judgment, however, the court is obliged to indulge all reasonable inferences in plaintiff's favor. Viewing the evidence in this light, a reasonable jury could credit plaintiff's testimony that he had no choice but to surrender the company to Gavin, who appeared at the time to be its sole financial lifeline. Thus the jury could conclude that Reiff did not "delegate" his responsibilities voluntarily but was effectively ousted by Gavin and divested of any meaningful control over the company's affairs.

Such forcible ouster would distinguish the present case from instances in which improper delegation was found. In *United States v. McCombs,* 30 F.3d 310 (2d Cir. 1994), for example, the Second Circuit upheld a trial court's finding that a corporate bookkeeper who admitted that it was her responsibility to make "sure that everyone got paid," but believed she could fulfill such responsibility by delegating it to others was a "responsible person." Similarly, in *Kalb v. United States,* 505 F.2d 506 (2d Cir.1974)—a case on which the Government relies heavily—the Second Circuit

held that corporate officers who are otherwise clearly responsible for company finances cannot avoid liability under § 6672(a) by voluntarily entering into financing agreements, which themselves prefer other creditors to the government. Although there are parallels, this case does not fall squarely under *Kalb.* On the evidence presented, a reasonable jury could still find that Reiff did not voluntarily cede business control to Gavin with a view toward shirking LuuLuu's financial obligations, but rather found himself sidelined when she was brought in to shore up the company's funding.

For the reasons described above-though the Government's case is compelling-summary judgment with respect to responsible person status is denied.

## IV. *Willfulness*

 Even if an individual is found to be a responsible person within the meaning of § 6672(a), the section imposes no liability on him unless his failure to collect, account for, or remit the withholding taxes was "willful." To be willful, conduct need not stem from an "evil motive or intent to defraud," *Kalb,* 505 F.2d at 511; but it must amount to more than negligence. *see id.* The principal component of willfulness is knowledge: a responsible person acted willfully within the meaning of § 6672(a) if he (a) knew of the company's obligation to pay withholding taxes, and (b) knew that company funds were being used for other purposes instead. *See, e.g., Hochstein,* 900 F.2d at 548; *Rem,* 38 F.3d at 643. Thus, failures were "willful" within the meaning of § 6672(a) if they were " 'voluntary, conscious and intentional—as opposed to accidental—decisions not to remit funds properly withheld to the government.' " *Kalb,* 505 F.2d at 511 (quoting *Monday v. United States,* 421 F.2d 1210, 1216 (7th Cir.1970)). Wilful

conduct may also be found where an individual demonstrates a "reckless disregard for obvious or known risks." *Monday,* 421 F.2d at 1215. On the contrary, a responsible person's failure to cause the withholding taxes to be paid is not willful if he reasonably believed that the taxes were in fact being paid. *See Kalb,* 505 F.2d at 511.

 Willful conduct may include a "failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the government." *Landau,* 155 F.3d at 101 (quoting *Kalb,* 505 F.2d at 511). Even if a responsible person were unaware of nonpayment of taxes on the date they were due, he is nonetheless liable for the nonpayment "if, when he became aware of the delinquency, the company had liquid assets with which to pay the overdue taxes." *Rem,* 38 F.3d at 643; *O'Callaghan,* 943 F.Supp. at 325–26. Failure to take affirmative steps to ensure payment of taxes before other creditors constitutes willfulness as a matter of law. *Id.* (citing *Kalb,* 505 F.2d at 511).

 A court may grant summary judgment as to willfulness "only when the facts are undisputed and application of the law to those facts will reasonably support only one ultimate conclusion." *Winter,* 196 F.3d at 347 (citing *Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426, 437–38 (2d Cir.1999)). If on the other hand, "the individual's position makes his claim of ignorance of nonpayment plausible and there are no other indicia of knowledge," a question of fact exists as to wilfulness. *Rem,* 38 F.3d at 644.

Viewed in the light most favorable to the plaintiff, the evidence presents genuine issues of material fact on the question of willfulness. The courts have made clear that knowledge of the company's obligation to pay withholding taxes and its diversion of funds to other purposes is the gravamen of willfulness under § 6672(a). *Rem,* 38 F.3d at 643. The *Kalb* court emphatically rejected the Government's contention in that case that one of the defendant's "should have known" that the company was failing to remit withholding taxes to the government by virtue of his position. 505 F.2d at 511. Negligence simply will not suffice for § 6672(a) liability. Nor is it clear that the courts' occasional invocation of "recklessness" actually means anything other than knowledge. In *Rizzuto,* for instance, the court explained that "recklessness" in this context means "gross negligence," but proceeded, enigmatically, to state that it is established when an individual *knows* of the obligation to pay taxes and *knows* that other creditors are being paid instead. 889 F.Supp. at 705. Similarly, though *Kalb* and *Landau* both refer to "notice" that withholding taxes are not being paid as a predicate for § 6672(a) liability, neither disposes of the case on that ground. Instead, each court analyzed the defendants' knowledge. In place of fancy footwork around "recklessness" and "notice," this court will simply do the same.

In the present case, the parties hotly dispute the issue of when Reiff actually knew of LuuLuu's failure to pay withholding taxes. If his own testimony is credited-as it may be at trial-he did not learn of the company's failure to pay withholding taxes until his conversation with Noceti in March 2001. Although he knew that LuuLuu stopped using ADP for its payroll services in July 2000, he testified he believed Laird's stated-though false-explanation that the move was an attempt to cut down on administrative costs. Moreover, Laird's testimony-the principal evidence on which the Government relies-itself shaky. When probed about his purported conversations with Reiff on the subject of with-

holding taxes, Laird testified that he was unsure of when, perhaps even whether, those conversations actually took place.

The Government likewise focuses on Reiff's knowledge of LuuLuu's dire financial straights and its failure to pay various creditors and employees (himself) to show that he was willfully blind to the risk that government withholding taxes were not being paid. Even accepting this formulation, the Government's evidence is a double-edged sword. The standard for willfulness is knowledge that other creditors are being preferred to the government, in other words that they, and not the government, are being paid. To the contrary, Reiff apparently knew that other creditors were *not* being paid while believing that the government was.

At trial, Reiff will bear the weighty burden of proving the absence of wilfulness. It is a burden he may yet fail to carry. Still, viewed in the light most favorable to Reiff, the evidence makes his claim of ignorance plausible, and that is all he needs to survive summary judgment.

It bears noting that Reiff's admitted assertion of control over LuuLuu's business affairs in March 2001 may support a finding that he was a responsible person within the meaning of § 6672(a) during some part of the final month of the last quarter for which unpaid taxes were assessed. Provided that was the case, under *Rem*, Reiff's subsequent failure to pay withholding taxes may be found willful if LuuLuu at that point had liquid assets with which to meet its withholding obligations. This court has found no case, however, which is on all fours with this scenario of an individual's assumption of responsible person status immediately prior to the end of the final quarter for which unpaid withholding taxes were ultimately assessed. Whether he would actual incur any liability and what the scope of that liability might be appears to be an issue of first impression. Because the parties have not focused on these questions and the findings at trial may well obviate the need to resolve them, the court will not opine on them at this time.

The Government's motion for summary judgment on the question of willfulness is denied.

### Conclusion

Defendant's motion for summary judgment is denied.

This constitutes the decision and order of the Court.